In the matter of Gerald Wayne NORTON and Sandra J. Norton, Defendants.

Alma I. CALLAHAN, Plaintiff,

v.

Sandra Jean NORTON, Defendants.

Bankruptcy No. 80–02371–SJ.
Adv. No. 80–0588–SJ.

United States Bankruptcy Court,
W. D. Missouri,
St. Joseph Division.

May 4, 1982.

Candace Barnes, St. Joseph, Mo., for plaintiff.

Hugh Miner, St. Joseph, Mo., for defendants.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL DECREE AND JUDGMENT DECLARING DEFENDANT'S INDEBTEDNESS TO PLAINTIFF IN THE SUM OF $14,806.63 TO BE NONDISCHARGEABLE IN BANKRUPTCY AND THAT PLAINTIFF HAVE AND RECOVER THE SAME SUM FROM DEFENDANT

DENNIS J. STEWART, Bankruptcy Judge.

Plaintiff alleges that the debtor took money from the plaintiff's bank account by issuing forged checks and forging her signature on a signature card. The action was

tried to the court on two separate dates.[1] The evidence then adduced warrants the following findings of fact.

The plaintiff Alma I. Callahan, formerly a resident of the State of Kansas and, at the time of the hearing in this action aged 72 years, was, on or about October 6, 1976, sent by her two adult sons to live with and be cared for by the debtor. There appears to have been in existence an agreement between the plaintiff's two sons and the debtor whereby the expenses of the care plus a fee for debtor's services would be paid for by the periodic social security benefits of the plaintiff.[2]

The evidence in respect to the number of checks and their amounts which were alleged to have been forged by the debtor as a means of taking them from the plaintiff's bank account has been difficult and time-consuming to parse. This is so because

counsel elected to ignore the pretrial order of the court requiring presentation of voluminous documents by means of summaries and instead to present each single check alleged to have been forged to the court.[3] In many respects, this has produced delay and confusion.[4]

The evidence which has been adduced clearly shows that the checks which have been presented were forged by the debtor. The plaintiff denied that any of the checks bore her signature although they were all subscribed with the name, "Alma I. Callahan." The debtor likewise denied having written the name of the plaintiff onto the checks.

But virtually all the other evidence corroborates the testimony of the plaintiff in this regard. It was actually the debtor who is the payee of the checks, who cashed them, and took the proceeds.[5] There is no

---

**1.** An initial hearing was conducted in St. Joseph, Missouri, on July 10, 1981. In that hearing, the parties both testified and some corroboration of the respective testimony of each of them was also offered, as were copies of the checks and the signature card on which it was alleged that the signature of Alma I. Callahan had been forged. The alleged forgeries, to the untrained eye, were not materially different from the genuine signature of Alma I. Callahan. Yet, neither party presented the testimony of any handwriting expert. Therefore, the court, under the provisions of Rule 706, appointed its own handwriting expert (after notice to the parties, neither of whom objected), received a written report from him, which was distributed to the parties, and held an adjourned hearing on October 30, 1981, at which the court-appointed expert testified and was examined at length by counsel for the respective parties.

**2.** See defendant's answer to plaintiff's interrogatory number two filed February 17, 1981.

**3.** As observed in note 1, *supra*, the testimony of a handwriting expert was not initially presented. If it had been, much of the documentary evidence might otherwise have been presented in summary fashion in connection therewith.

**4.** See notes 1 and 3, *supra*.

**5.** Checks purporting to be signed by the plaintiff were issued on the following dates in the following amounts, which total $2,392.35:

| Date | Amount |
| --- | --- |
| Jan. 6, 1977 | $350.00 |
| Jan. 11, 1977 | 50.00 |
| Jan. 15, 1977 | 10.00 |
| Jan. 18, 1977 | 10.00 |
| Jan. 22, 1977 | 25.00 |
| Jan. 23, 1977 | 75.00 |
| Feb. 1, 1977 | 250.00 |
| Feb. 5, 1977 | 50.00 |
| Feb. 1977 | 75.00 |
| Feb. 1977 | 25.00 |
| Feb. 26, 1977 | 45.00 |
| March 3, 1977 | 55.00 |
| March 3, 1977 | 113.78 |
| March 8, 1977 | 12.00 |
| March 16, 1977 | 80.00 |
| March 23, 1977 | 80.00 |
| March 23, 1977 | 30.00 |
| April 8, 1977 | 200.00 |
| April 8, 1977 | 71.57 |
| April 9, 1977 | 250.00 |
| Feb. 18, 1977 | 160.00 |
| Aug. 6, 1977 | 375.00 |

Other checks which are shown by the evidence to have been subscribed by the defendant with the signature of Alma I. Callahan are written in favor of payees other than the defendant. The purpose of these expenditures, nor who were benefitted by them, is not demonstrated with any clarity by the evidence. But the liability of the defendant does not depend upon her having received the benefit of the property converted. See note 17, *infra*. A converter's liability does not "depend upon his having derived any personal benefit from the alleged conversion." *Darling & Co. v. Fry*, 24 S.W.2d 722, 724 (Mo.

evidence to support or corroborate the factual contention of the debtor that she cashed one of the checks at the drawee bank in the presence of the plaintiff.[6] On the other hand, however, there is evidence to support the plaintiff's contention that it is not her signature on the several checks and the signature card which are in evidence, although they bear a subscription which purports to be her signature. The court-appointed expert who examined the checks and signature card, together with other exemplars of the plaintiff's and de-

fendant's signatures, concluded that the signatures of "Alma I. Callahan" appearing thereon were not authentic. He further concluded that her signature was one which was relatively easy to simulate and that it could have been simulated by the defendant in this action.[7]

The defendant's position is that the monies were used to defray expenses in connection with the case of the plaintiff.[8] But the evidence otherwise demonstrates that the contract of the plaintiff's sons with the defendant provided for the care and ex-

1930). Additionally, the evidence demonstrates that the defendant opened a savings account at the First Stockyards Bank on April 9, 1977; that the deposit then made by her to the savings account was the sum of $8,395.01; that this followed the defendant's endorsing "Alma I. Callahan" on a check to Alma I. Callahan from the Kansas Secured Title and Abstract Company, Inc., in the sum of $12,895.01; and that the account was closed by the defendant on April of 1978. It is the position of the plaintiff that, based on the evidence which shows that total deposits in these two accounts amounted to $14,966.63 and that the plaintiff wrote only one check on the account for a total of $160, that the sum of $14,806.63 is the correct amount of damages. The evidence before the court supports this contention.

6. The plaintiff, in her testimony, has steadfastly denied that she ever authorized the defendant to apply her signature to checks or signature cards or to withdraw any sum of money from the plaintiff's bank account. There was some testimony of the defendant's witnesses of an instance in which the defendant cashed a check at plaintiff's request at the drawee bank. But there was no evidence that that check was one of those which are the subjects of the action at bar.

7. The written report and testimony of the court-appointed expert, when considered together with the other evidence in the case, clearly supports a conclusion that it was the defendant who simulated the look-alike signatures of the plaintiff on the checks and the signature card. The testimony of the court-appointed expert is to the effect, that the signature on the signature card purporting to be that of the plaintiff is not really that of plaintiff. But defendant, in her testimony, which preceded that of the court-appointed expert, testified that one of the signatures on the signature card was in fact that of Alma I. Callahan and that she knew this of her personal knowledge.

8. The written opinion of the court-appointed expert, dated September 22, 1981, states:

"After a careful examination and comparison of the submitted documents I am of the following opinion:
"The Alma I. Callahan signatures on the escrow agreement (Pl. Ex. 2), the deed (Pl. Ex. 89), the signature card for Checking Account 63–702–5 (Pl. Ex. 7), and Check No. 126 (Pl. Ex. 18); and the entries in the deposit record under Check No. 126 and 127, (Pl. Ex. 69), are all in the handwriting of the same person and are all the genuine handwriting of Alma I. Callahan. In reaching this conclusion, the signatures on the deed and escrow agreement have been considered as known genuine signatures of Alma I. Callahan.
"The Alma I. Callahan signatures on all other documents submitted for examination are nongenuine and were written by some person other than Alma I. Callahan who attempted to imitate the signature of Alma I. Callahan. Specifically, the Alma I. Callahan signatures on the following documents are nongenuine: Signature card for savings account 79–729–4, Pl. Ex. 70; Check No. 14729 for $12,895.01, Pl. Ex. 3; Check No. 1293 for $4,000.00, Pl. Ex. 43; and all checks drawn on account 63–702–5, as described above, except Check No. 126, Pl. Ex. 18.
"Because the imitation of another's signature is generally recognized as being the best means of disguising one's handwriting, here, as is usually the case, it is not possible to determine positively the authorship of the nongenuine signatures. However, after comparing the writing on the post cards with the nongenuine signatures in question, I am of the opinion the person who wrote the post cards, Pl. Ex. 90, 91 and 92, could have fabricated all of the purported signatures of Alma I. Callahan hereinabove designated as nongenuine.
"This opinion is definite in so far as it relates to original documents. As to photocopies, this opinion is subject to confirmation should the originals of the photocopies be located and submitted for examination."

penses to be paid for by the sons.[9] There is no credible evidence of any authority for this money to be taken from the plaintiff's bank account, granted either by the plaintiff or her sons, and there has been no accounting for the disposition of the proceeds of the checks.[10]

### Conclusions of Law

The decisions in this district which have defined "willful and malicious injury ... to property," within the meaning of § 523(a)(6), have generally erected a standard whereby the plaintiff must demonstrate a "subjective, conscious intent" of the defendant to violate the plaintiff's known right to title or possession of the property. See, e.g., *In re Bellmer*, Civil Action No. 79–6042–CV–SJ (W.D.Mo.1980). Even in cases decided before the advent of the new Bankruptcy Code, this standard was applied to excuse the conversion of property when the bankrupt had a "good faith, even though unreasonable" belief that he might deal with another's property as his own. *Matter of Roberts*, 8 B.R. 291, 293 (W.D.Mo.1981). This "subjective" standard of "willful and malicious" although almost universally rejected by the decisions

made under the former Bankruptcy Act,[11] is nonetheless fortified by the legislative history of the new Bankruptcy Code, which rejects the "objective," "reckless disregard" standard which had formerly prevailed.[12] And the cases decided under the new Code, accordingly, tend to forgive the conversion which is alleged unless there can be proven a specific "intent to harm" the plaintiff.[13] One decision, in applying the "intent to harm" rule, observes that the rule has little meaningful effect in respect to a case of conversion in which the converter's intent is ordinarily to obtain the money, property or other value converted.[14]

A few other decisions, noting that the new Code's rejection of the rule of *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), and the "reckless disregard" standard flowing therefrom did not significantly change the law, have continued to apply the pre-Code standard. "The phrase 'willful and malicious injuries to the person or property of another' in 11 U.S.C. § 523(a)(6) do not necessarily connote ill will or special malice. A wrongful act done intentionally without just cause or a lawful basis is sufficient." *Matter of Friedenberg,*

9. The contention is that the money thus went ultimately, albeit indirectly, to the benefit of the plaintiff.

10. See note 8, *supra.*

11. See *Matter of Catron*, 15 B.R. 408, 410 (Bkrtcy.W.D.Mo.1981)

"... the advent of the new Code gave those decisions additional impetus in its express rejection of the 'reckless disregard' standard. See the Legislative History under § 523(a)(6) of the Bankruptcy Code to the effect that '[t]o the extent that *Tinker v. Colwell* 1[93] U.S. 473 [24 S.Ct. 505, 48 L.Ed. 754] (190[4] ), held that a looser standard is intended, and to the extent that other cases have relied on *Tinker* to apply a "reckless disregard" standard, they are overruled.' Consequently, decisions under the Code have followed the lead of the radical decisions noted above which were decided in the waning days of the old Bankruptcy Act. See, e.g., *Matter of Nelson*, 10 B.R. 691, 692 (N.D.Ill.Bkrtcy, 1981). (Conversion of secured property and disposition by sale is not willful and malicious without a demonstrated 'intent to do harm.' The court notes that, 'when the injury is conversion of secured property such a standard virtually renders the remedy meaningless.

Under what circumstances, for instance, would a debtor ever sell secured property out of malice? Nevertheless ... this Court will follow it in the absence of a binding appellate decision to the contrary.'); *In re Davis*, 11 B.R. 156 (D.Vt.Bkrtcy 1980) (Conversion of secured property with intention to repay money gained from its sale to plaintiff at a later date); *In re Baiata*, 12 B.R. 813, 818 (E.D.N.Y.Bkrtcy 1981) (Regardless of proof of injuries to property, their willful and malicious character could not be established when the plaintiff 'failed to call any of the workman who caused the damage to testify to their intent.')"
1A Collier on Bankruptcy ¶ 17.17 (1976) "Thus the conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, is a willful and malicious injury within the meaning of the exception."

12. See *Matter of Catron*, note 11, *supra.*

13. See *Matter of Catron*, note 11, *supra*, and cases therein cited.

14. *Id.*

12 B.R. 901, 905 (Bkrtcy.S.D.N.Y.1981). "If an act of conversion is done deliberately and intentionally in knowing disregard of the rights of another, it falls within the statutory exclusion even though there may be an absence of special malice". *In re McCloud*, 7 B.R. 819, 825, 826 (Bkrtcy.M.D. Tenn.1980). This statement of the law accords with the general law on the subject, including that of the State of Missouri.[15]

The facts of this case, furthermore, deserve the application of the latter standard. Insofar as it is demonstrated that the defendant knowingly and by deceit gained the money of the plaintiff,[16] this case must be regarded as one of the extreme cases to have come before the court. It would stultify the provisions of the new Code [17] to apply them so that this particular conversion was not excluded from the general discharge in bankruptcy.

If the "subjective" and "intent to harm" standards are to be applied, however, this court believes that, despite the defendant's express denial of any intention to harm the plaintiff, that the surrounding facts and circumstances demonstrate the contrary. The relatively long period through which successive withdrawals were made from the plaintiff's account by means of careful and repeated imitations of the plaintiff's signature betoken a state of mind other than one which could be characterized as "good faith" or "unintentional." This egregious factual situation cannot conscionably rate a discharge in bankruptcy.[18]

It is therefore

ORDERED, ADJUDGED AND DECREED that the defendant's indebtedness to plaintiff in the sum of $14,806.63 be, and it is hereby, declared to be nondischargeable in bankruptcy. It is further

ADJUDGED that plaintiff have and recover the same sum from the defendant.

---

**15.** Punitive damages are awardable under Missouri law for conversions committed with "legal malice." Under state law, exemplary damages may be awarded for "wilful, wanton or malicious conduct (and) ... the standard for assessment of punitive damages is that there be a wrongful act intentionally committed and without just cause or excuse ... legal malice also can arise from acts done in reckless disregard for another's rights." *Price v. Ford Motor Credit Co.* 530 S.W.2d 249, 253 (Mo.App.1975). Cf. note 11, *supra*.

**16.** See note 7, *supra*.

**17.** It appears that the species of nondischargeability termed as "larceny" by § 523(a)(4) of the new Bankruptcy Code is, at most, of questionable applicability in this case. See the Legislative History to § 523(a)(4) to the following effect: "Larceny is the fraudulent and wrongful taking and carrying away the property of another with intent to convert such property to his (the taker's) use without the consent of the owner. As distinguished from embezzlement, the original taking of the property was unlawful." 2 Collier on Bankruptcy ¶ 523.14(2), p. 523–106 (1980). In this action, however, the element of intention to convert to one's own use is not, as is elsewhere mentioned, satisfactorily established. Therefore, conversion appears to be the proper category of the liability in this action. Liability for conversion may include appropriating the property to one's own use or that of another. Conversion is "the taking or detention of the chattel ... with intent to convert it to the taker's own use, or that of some other person." *Owens v. Automobile Recovery Bureau, Inc.*, 544 S.W.2d 26, 33 (Mo.App.1976). Further, trover can be maintained against one who withdraws monies from a bank account without authorization. Cf. *Breece v. Jett*, 556 S.W.2d 696, 710 (Mo. App.1977); *R. H. Kobusch Furniture & Carpet Co. v. Lowenberg*, 194 Mo.App. 551, 185 S.W. 747, 748 (1916) (it is not conversion when the drawer has authority to write checks on the account). But, although conversion does not lie simply to enforce the payment of a money debt, money may be the subject of conversion. "(T)rover will lie when money has been converted without any assent on the plaintiff's part that the relation of debtor and creditor should arise, as it would with any other kind of personal chattels, but ... '(t)rover does not lie to enforce a mere obligation to pay money.' ... 'There can be ... no conversion of money, unless there was an obligation on the part of defendant to deliver specific money to plaintiff, or unless the money was wrongfully received by defendant.'" *Dawkins v. National Liberty Life Insurance Company*, 263 F.Supp. 119, 121 (D.S.C.1967) (Emphasis added).

**18.** See, as an alternative theory, 18 Am.Jur.2d *Conversion* § 28, on conversion by fraud.