In the Matter of David L. HOMER, and Diane M. Homer, Debtors.

Robert E. JENKINS, d/b/a Green Acres Farms, Plaintiff,

v.

David L. HOMER, and Diane M. Homer, Defendants.

Bankruptcy No. 82–03920–SW–W.
Adv. No. 83–0485–SW–W.

United States Bankruptcy Court, W.D. Missouri, W.D.

Aug. 7, 1984.

James C. Jarrett, Heavner, Jarrett & Kimball, P.C., Kansas City, Mo., for plaintiff.

Thomas A. Schwindt, Shockley, Reid & Koger, Kansas City, Mo., for defendants.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL JUDGMENT DENYING PLAINTIFF'S COMPLAINT FOR A DECREE OF NONDISCHARGEABILITY AND DISMISSING DEFENDANTS' COUNTERCLAIM

DENNIS J. STEWART, Bankruptcy Judge.

This is an action brought by the plaintiff under section 523(a)(2) and 523(a)(6) of the Bankruptcy Code seeking a decree of nondischargeability to it on the grounds that:

"defendants, prior to the final bankruptcy, willfully and maliciously caused injury to plaintiff and to the property of plaintiff by selling or disposing of all or part of the ... secured property of plaintiff without acquiring permission to do so, or accounting for the proceeds of any such transaction. That said behavior by defendants was a fraudulent appropriation of property entrusted to them.

"That defendants willfully and maliciously misrepresented to plaintiff that they would harvest all crops under the existing leases when in fact they knew that they were not going to harvest said crops, thus causing plaintiff to sustain damages.

"That defendants fraudulently obtained farm products, equipment and fuel from plaintiff by stating that they would use same on property under lease when in fact said farm equipment, products and fuel was [sic] used by defendants for other purposes."

The defendants, in their answer, denied the material allegations of the complaint. After appropriate pretrial of the issues thus joined, the court issued its pretrial order on January 13, 1984, summarizing the triable issues as follows:

"After joinder of the issues by the pleadings, the court entered its order on May 3, 1983, setting its trial of the merits for May 26, 1983. The parties, however, jointly moved for a continuance from that date. After the granting of this joint request for continuance and the resolution of some disputes concerning pretrial discovery, the court sought to convene a trial of the merits on August 31, 1983. At that time, for sundry reasons, neither party was prepared to go forward with a trial of all the merits, but it was agreed that the defendants should submit to the court the documents which they contended to demonstrate the absence of any property interest by the plaintiff.

"This has now been done. Further, by means of its answers to the defendants' written interrogatories, which answers were filed in this action on August 31, 1983, the plaintiff has particularized, as follows, the property in which it claims a security interest in the following:

'A. Thirty-five (35) big round bales of hay.

B. Diesel fuel having fair market value of Four Thousand Dollars ($4,000.00).
C. Fertilizer having a value of ... $7,596.00 ...
D. Chemical having a value of ... $1,385.00 ...
E. Milo crop.'

"It is further stated as a matter of factual contention in the same answers to interrogatories that:

'Defendant David L. Homer appropriated [the above] property for their [sic] own use and misrepresented to Plaintiff that he would harvest milo crop when, in fact, he knew said representation to be false ... all property was disposed of during the period of the Lease, January 1, 1982, through December 31, 1982.'

"Pursuant to the directions of the court, the plaintiff has also submitted and served copies of documents which purport to demonstrate a security interest in 'all grain and crops located in sections 3, 4, 5, 6, 7, 8, 9, Township 37–38 North, Range 30 West, Being the same fields leased in 1979, 1980, and 1981 crop year.' This security interest purports to be perfected by means of the filing of a financing statement in the office of the Vernon County recorder on March 16, 1982. An affidavit of Robert E. Jenkins has also been supplied to the effect that 'there is presently stored on the real property owned by plaintiff crops which were harvested from plaintiff's land during the year of 1982' of a fair market value of $213,600.00, including 50,000 bushels of milo worth $100,000.00, 'determined from the market value of said grain on the date of signing of this Affidavit based upon the Regional Commodity Price within the Kansas City area.' A copy of a lease agreement between the parties, dated January 1, 1982, has also been submitted, which in part provides that the plaintiff shall 'have a statutory lien as landlord and the security agreement and financing statement 34909 in addition to financing statement no. H68 filed with the Recorder of Vernon County, Missouri, filed January 9, 1979, is a First Lien.'

"The defendants, on November 10, 1983, stated the following as their contentions respecting claims of security interest in the collateral:

'Defendants state that they entered into a security agreement whereby they expressly granted to the Jenkins Green Acres Farms a security interest in all grain and crops, on certain specified property as described in this court's order of October 26, 1983. Defendants stipulated to a prior court order granting relief from the automatic stay order so that certain amounts of grain could be removed and disposed of; however no accounting for these crops has ever been furnished these defendants, the trustee nor this court. The defendants claim no interest in these crops at this time if they brought less than what was owed against them.

'Defendants state that the security agreement signed by them grants Jenkins Green Acres Farms "If the collateral included livestock" a security interest in hay. However, since the security agreement does not include livestock as collateral hay is not covered and therefore plaintiff has no security interest in any hay even if it existed which defendants deny. Nothing in the security agreement signed by the defendants grants a security interest to plaintiff, in diesel fuel, fertilizer or chemicals. As defendants have stated earlier, to their knowledge the relief was given from the automatic stay order to dispose of the defendants' milo crop and defendants assume that has been done. The Plaintiff has not accounted for any milo and the defendants would only claim an interest in it if the proceeds exceeded what was owed against it.

'The defendants do have a counterclaim for machinery and fertilizer converted by the plaintiff which they hereby request leave of court to file. The

defendants' rental agreement specifically makes the defendants responsible for the cost of the fertilizer.

'The defendants would point out additionally when the plaintiff was asked to state "the act which you claim each defendant performed" failed to state that the defendant Diane M. Homer did anything or said anything so as to cause injury to plaintiff or his property. Defendants submit that if factually and as a matter of law Diane M. Homer should be dismissed from this suit.'

"The plaintiff, in turn, has responded to the defendants' contentions as follows:

'Plaintiff admits that he entered into an Agreement and was granted security interest.

'Plaintiff states that he was unable to harvest any crops after the stay was lifted due to weather conditions. Further, Plaintiff has furnished to the Court by Affidavit the total number of bushels of stored grain and its value on date the stay was lifted.

'The hay in question was grown on real property described in Plaintiff's Security Agreement, and is included in the typed in portion of said Security Agreement as, "All grain and crops on Jenkins Green Acres Farms."

'Plaintiff's Complaint alleges that Defendants fraudulently obtained farm products, equipment and fuel from Plaintiff by stating that they would use same on property under lease, when, in fact, Defendants used it for other purposes. It is Plaintiff's Claim that the diesel fuel, fertilizer and chemicals were owned by Plaintiff under terms of Contract For Lease, dated January 1, 1982. Plaintiff contends that the above-stated products were applied by Defendants to farms other than Plaintiff's.

'Plaintiff denies that the Defendants are entitled to any machinery or fertilizer or that Plaintiff converted same. 'Plaintiff states that both Plaintiff's Complaint and Proof of Indebtedness furnish documents signed by both Debtors, David L. Homer and Diane M. Homer, indicating joint liability.'

"It is apparent from the respective responses of the plaintiff and defendants to the court's successive orders that issues of material fact exist which require a hearing for their resolution, including issues of whether hay can properly be characterized as growing crops; whether the defendants in fact converted any of the property in which there was a valid and perfected security interest; if so, whether such conversion was willful and malicious; and whether plaintiff converted any of defendant's machinery and fertilizer."

By means of the same order, the court set the trial of the merits of this action for January 31, 1984. Prior to that time, on January 24, 1984, the defendants filed an "amended answer and counterclaim" raising (1) a defense predicated on "the statute of Limitations and more specifically Rule 409 of the Rules of Bankruptcy Procedure which bars claims filed after 90 days after the date first set for the first meeting of creditors" and (2) a counterclaim based upon allegations that plaintiff converted some $17,361.14 of the defendants' property.

This belated filing of the amended answer and counterclaim gave rise to a motion filed on January 26, 1984, filed by the plaintiff requesting that the court sever the counterclaim for trial or else grant a continuance of the trial date which was then set, January 31, 1984. The court did not have time to rule in writing on the motion then filed, but orally announced to the parties and counsel that the trial would go forward on the claim of the plaintiff alone on January 31, 1984, and that the facts which underlay the counterclaim, belatedly filed without leave of court,[1] would be con-

---

1. The amended answer and counterclaim was not submitted for filing within 20 days after the initial answer was served; therefore, leave of court for its filing was required. See Rule 15(a), F.R.Civ.P.

sidered later. As is further set out below, for the reasons there stated, the counterclaim based upon allegations of conversion should be dismissed for want of standing of the defendants to prosecute the action.

The hearing of the merits of the claim was then commenced on January 31, 1984. It was concluded on February 2, 1984, in Kansas City, Missouri, whereupon the plaintiff appeared personally and by James C. Jarrett, Esquire, his counsel, and the defendants appeared personally and by counsel, Thomas A. Schwindt, Esquire.

The evidence which was then adduced showed that the plaintiff and defendant, David L. Homer sometime prior to or in 1982, had entered into an agreement which concerned the harvest of certain crops which belonged to the plaintiff; that the agreement was substantially to the effect that the defendant David L. Homer agreed to harvest certain crops for plaintiff, to pay the cost of combining, and to share the net proceeds with plaintiff; [2] that the harvest which took place pursuant to this agreement took place during a rainy season and was filled with complications; that, according to the testimonial claims of the defendants, there was no realization of any proceeds which, according to the terms of the agreement, could be paid over to the plaintiff, when the costs of harvesting were subtracted; that certain hay and diesel fuel was claimed by the plaintiff to be subject to a security agreement executed by the defendants in his favor; that the hay was removed from the farm property without plaintiff's permission and none of its proceeds was paid over to him; that the diesel fuel was also consumed or removed; that, according to the testimony of the plaintiff, the defendant David L. Homer admitted to him "that he used it for other purposes"; that the plaintiff, as he has stated in his testimony in this action, does not contend to have any knowledge that the defendant Diane M. Homer had any part in the remov-

al of any property; that, in his view, she "is a lovely person ... and I have not said that she stole anything from me"; that, accordingly, in the course of the hearing of this action, he agreed in open court voluntarily to dismiss the within complaint insofar as it pertains to Diane Homer; that, according to the uncontradicted evidence adduced through the testimony of the defendants and others who worked with them during the harvest, the frequent preharvest storms during 1982 substantially reduced the milo crop which had been planted; that what milo was still standing as of November 1982 was administered a *coup de grace* by the occurrence of several tornadoes on the date of December 2, 1982; that, as a result of this weather, there was virtually no success in harvesting the milo; that the defendant David L. Homer and his employees attempted to perform the harvest, but the result, according to the testimony of Victor Charles Helstrom, one of the employees, was that they would "work all day" and produce "not hardly binload in the combine"; that it soon became apparent that, because the milo had been beaten down to the ground by the recurrent bad weather, that it was "futile" to harvest it; that the last milo was combined on December 1 and 2, 1982, and, at the conclusion of the harvest, no milo was left standing which had been originally planted; that, at the conclusion of this harvest, 80% of the anhydrous ammonia supply was left in tanks on the farm; that, in January 1983, the defendants moved off the farm when they "were given notice to get off"; that they, according to Mr. Homer's testimony, left the anhydrous ammonia tanks on the farm when they left and the "storage tank was nearly full"; that, according to Mr. Homer's testimony, he did not intend to grant the plaintiff any security interest in the diesel fuel when he executed the security agreement in favor of the plaintiff; [3]

---

**2.** The texts of the agreements then entered into between plaintiff and defendants are further summarized, *infra,* in the text of this memorandum.

**3.** As is further noted below, it does not appear from the documentary evidence presented that in fact any security interest was granted in the diesel fuel. But this, in reality, is a moot question by reason of the below determination of

that, furthermore, he used up virtually all the diesel fuel, except some 500 gallons which he left in tanks when he evacuated the property, in the tractor and combining operations; that the same testimonial contentions were made by Mr. Homer in respect of farm chemicals—that he did not intend to grant plaintiff any security interest in them and, further, they were fully or substantially consumed in the farming operations; that he did not put up any hay at all in 1982 and the 1981 hay was "valueless" because of extensive rotting; that he further claims that plaintiff actually received all the corn which he harvested or its proceeds and all the soybeans and milo; that, as observed above, not all of the milo was harvested because of the destruction and beating visited upon it by the storms which occurred in the late fall and early winter of 1982 and because of droves of geese which feed upon the milo fields and which proved impossible to disperse because of their numbers; that, accordingly, these disasters resulted in the nonharvesting of 600 to 700 acres; that, from the acreage which was harvested, he delivered the yields of a great acreage to the plaintiff; that the acreage which was farmed was approximately 3,000 of the 3,600 tillable acres; that he started combining the milo in late October 1982; that the "good milo was all cut except for 30 or 40 acres"; that the average price of the milo would have been about $2.00 per bushel;[4] that he had two trucks hauling grain during the months of October and November in 1982 and employed 3 to 5 laborers, including the two truck drivers; that there had, prior to December 1982, not been a hard freeze, but rather "just enough frost to burn leaves"; that, subsequently, he harvested what he could prior to the winds and storms which began "right around Thanksgiving"; that

he stopped trying to harvest after the storm of December 1, 1982; that he used 500 gallons of diesel fuel in his truck; that, between the dates of November 5, 1982, and December 7, 1982, he spent some $1,779.46 on diesel fuel which in the process of combining 1300–1400 acres of milo that the 25 big round bales of hay in which the plaintiff claims an interest were "rotted and worthless" and therefore were burned in late 1982 or early 1983; that the chemicals which were used on the crop are either completely used or, as with respect to the anhydrous ammonia now on hand, the debtors claim an interest in it[5] as does the plaintiff;[6] and that, in general, the plaintiff has been paid all proceeds of crops to which he is entitled by virtue of the agreements between the plaintiff and defendants, but any shortage has come about because of circumstances beyond the control of the debtors.

The material documentary evidence which was adduced in the course of the trial of this case was to the following effect:

(1) A copy of a "contract for lease of real estate" between plaintiff and defendants for the lease for the year 1982 of the plaintiff's farm property for the sum of $713,235.60 and granting plaintiff, *inter alia*, a "first lien" on "all crops on said Real Estate." It is further pertinently agreed in this instrument that "[a]ny crops removed from the property for sale of storage shall be entitled in first and second parties' names and all checks from any sale of any crops shall be made out in first and second parties' names until promissory note is paid in full and all of the aforesaid conditions and obligations are fulfilled."

---

this court that any conversion of the property was not a willful and malicious conversion which would be nondischargeable in bankruptcy.

**4.** The basis of the plaintiff's claim for damages is further explicated below in the text of this memorandum.

**5.** As is further noted below, the proof of the plaintiff's security interest or ownership of the property is less than perfect, but the question is moot by reason of this court's finding that any conversion was not willful and malicious so as to form a predicate for a decree of nondischargeability.

**6.** See note 5, *supra.*

(2) A security agreement purporting to be executed on January 1, 1982, by defendants in favor of plaintiff with respect to:

"All Grain and crops on Jenkins Green Acres Farms (formerly Richter Farms) [description of location omitted] together with all additions, accessions, and *substitutions* thereto and therefor, and all similar property hereafter acquired ... Proceeds of Collateral are also covered but this shall not be construed to mean that Bank [sic] consents to any sale of such collateral." (Emphasis added.)

The defendants undertake in this agreement not to "permit any of the Collateral to be removed from the location specified herein without the written consent of Bank." Sale of the collateral without consent of the secured party is made an "event of default" by the terms of the security agreement.

(3) A copy of a financing statement purporting to be filed with the Vernon County recorder on March 16, 1982, and purporting to cover the following collateral:

"All Grain and Crops located in Sections 3, 4, 5, 6, 7, 8, 9, Township 37–38 North, Range 30 West; Sections 12 & 36, Township 37–38 North, and Sections 31, 32, 33, 34, Township 38 North, Range 30 West, Being the same fields leased in 1979, 1980, and 1981 crop year."

(4) A chart containing calculations by the plaintiff as to the revenue which should have been received by the defendants in the course of their farming operations for the year 1982, containing the following principal figures:

| | | |
|---|---|---|
| 268.7 acres at 90 bushels | 24,183 bushels | |
| $2.35 per bushel | $56,878.42 | |
| $20.00 per combine | $ 5,380.00 | |

| | | |
|---|---|---|
| Net | $51,498.42 | |
| 222.3 acres at 90 bushels | 20,007 bushels | |
| $2.35 per bushel | $47,016.45 | |
| $20.00 per combine | $ 4,450.00 | |
| Net | $42,566.45 | |
| 140.6 acres/70 acres at 10 bushels | 700 bushels | |
| $2.35 per bushel | $ 1,645.00 | |
| $20.00 per combine | $ 1,400.00 | |
| Net | $ 245.00 | |
| 134.4 acres/67 acres at 12 bushels | 804 bushels | |
| $2.35 per bushel | $ 1,889.40 | |
| $20.00 per combine | $ 1,340.00 | |
| Net | $ 549.40 | |
| 58.4 acres at 10 bushels | 580.40 bushels | |
| $2.35 per bushel | $ 1,291.80 | |
| $20.00 per combine | $ 1,168.00 | |
| Net | $ 123.80 | |
| Total Net | $94,983.07 | |

*Conclusions of Law*

(1) *Claim of Fraud in Promising to harvest crops and pay over proceeds*

 It is the initial contention of the plaintiff that the defendant David L. Homer committed fraud when he promised to harvest the crops and turn the proceeds of the crop harvests over to the plaintiff. It is thus alleged in the complaint at bar that "defendants, willfully and maliciously misrepresented to plaintiff that they would harvest all crops under the existing lease when in fact they knew that they were not going to harvest said crops, thus causing plaintiff to sustain damages." In proving the type of fraud which provides the basis for a decree of nondischargeability, the plaintiff is obliged to show positive fraud involving moral turpitude or wrong and it is not sufficient to demonstrate implied fraud.[7] Accordingly, he must establish by clear and convincing evidence, *inter alia,* that a material misrepresentation has been made and that it was made intentionally.[8] In respect of the case at bar, it has been held as a general proposition that, while it cannot be fraud not to perform according

---

**7.** "Courts have consistently held that in order ... to bar a discharge, the party alleging fraud must prove actual or positive fraud, not merely fraud implied by law." *In re Taylor,* 514 F.2d 1370, 1373 (9th Cir.1975).

**8.** "According to Sweet v. Ritter Finance Co., 263 F.Supp. 540, 543 (W.D.Va.1967), the objecting party's burden of proof consists of five elements: '... (1) the debtor made the representa-

tions; (2) that at the time he knew they were false; (3) *that he made them with the intention and purpose of deceiving the creditor;* (4) that the creditor relied on such representations, and (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.' (Emphasis supplied.)." *In re Taylor, supra* note 7, at 1373.

to a contract, the misrepresentation of one's intention to perform can constitute fraud within the meaning of the nondischargeability section. "A mere promise to be executed in the future is not sufficient to make a debt nondischargeable, even though there is no excuse for the subsequent breach. A misrepresentation by the bankrupt of his intention, however, may constitute a false representation within the exception." 1A Collier on Bankruptcy para. 17.16, pp. 1638, 1639 (1976). Further, the fact of the absence of intention to perform at the time the representation is made must be proven by clear and convincing evidence.[9] This court is aware that intention is a matter seldom or never susceptible of direct proof and that it is therefore necessary and acceptable to prove intention by circumstantial evidence.[10] Nevertheless, fraud cannot be demonstrated by circumstances which permit reasonable inferences of non-fraudulent conduct. "The rules of law do not permit a court to find fraud where the facts out of which it is supposed to arise may fairly be reconciled with honesty of purpose and purity of intention." 37 Am.Jur.2d *Fraud and Deceit* section 472 (1968). Accordingly, this court has narrated and summarized the testimony rendered in the hearing at some length for the purpose of demonstrating that, considered on the basis of the whole record and cumulatively, the circumstances of this case warrant a finding against fraud. The actions of the defendants were consistent with a finding of non-fraudulent conduct. Although the loss which was occasioned to the plaintiff was allegedly large, the facts which caused that loss were, at least in great part, wholly without the control of the defendants and, otherwise, there is no event or happenstance which does not appear to be in conformance with an innocent intention to perform, but one which was frustrated. Accordingly, the request for a decree of nondischargeability, insofar as it is predicated on section 523(a) of the Bankruptcy Code must be denied.

### (2) *Claim of Willful and Malicious Conversion*

Plaintiff also predicates a claim for a decree of nondischargeability on allegations that the defendant willfully and maliciously within the meaning of § 523(a)(6) of the Bankruptcy Code, converted crops and other property—fertilizer and diesel fuel, primarily—in which the plaintiff claims a cognizable security interest. In this regard, again, the plaintiff, in order to prevail on his request for a decree of nondischargeability, must sustain an extraordinarily high burden of proof. As this court has outlined in some of its prior decisions under the new Bankruptcy Code, the courts which have defined "willful and malicious" have traveled along two different lines— one which applies the old definition of "intentional violation of a known right of the plaintiff"[11] and the other which applies a

9. "Under the Bankruptcy Act of 1898, to bring a debt within the exception of Section 17a(2), the fraud had to be proved by clear and convincing evidence. The legislative history of section 523(a)(2) of the Code suggests that the burden of proof under the Code should be the same as the superseded Section 17a(2)." 3 Collier on Bankruptcy para. 523.08(5), p. 523–49 (1984).

10. See, e.g., *Matter of Isbell,* Civil Actions Nos. 82–5103–CV–SW–4 and 82–5104–CV–SW–4 (W.D.Mo. Apr. 26, 1983): "The courts have repeatedly recognized that it is extremely difficult to prove an intent to defraud by direct proof." (Clark, D.J.).

11. See, e.g., *Matter of Norton,* 21 B.R. 725 (Bkrtcy.W.D.Mo.1982), and cases therein cited. "This subjective standard ... although almost universally rejected by the decisions made under the former Bankruptcy Act, is nonetheless fortified by the legislative history of the new Bankruptcy Code, which rejects the 'objective', 'reckless disregard' standard which had formerly prevailed ... A few other decisions, noting that the new Code's rejection of ... the 'reckless disregard' standard ... did not significantly change the law, have continued to apply the pre-Code standard. '.... A wrongful act done intentionally without just cause or a lawful basis is sufficient.' *Matter of Friedenberg,* 12 B.R. 901, 905 (Bkrtcy.S.D.N.Y.1981)." 21 B.R. at 728–729. See also *In re Lewis,* 17 B.R. 46, 48 (Bkrtcy.W.D.Ark.1981) ("Thus, when a defendant has disposed of collateral without permission but with some notion, however erroneous it would appear to be, that he has a right to dispose of it, there can be no finding of willful and malicious conversion.").

difficult subjective standard requiring an evidentiary showing of actual evil intention or intent to harm.[12] The decisional authority which has been laid down by our district court places it distinctly within the latter rule. In *In re Bellmer*, Civil Action No. 79–6042–CV–SJ (W.D.Mo.1980), the Honorable Howard F. Sachs made it clear that the standard to be employed in this district was a "conscious" and "subjective" one. In so doing, he ruled that, in a case similar to that at bar, the debtor's ignoring an inconspicuous, albeit clear, provision in the contract against disposition of collateral was insufficient to constitute "willful and malicious" conversion within the meaning of § 523(a)(6), supra.[13] Later, in *In re Roberts*, 8 B.R. 291, 293 (W.D.Mo.1981), the district court seemed to carry the standard of subjectivism even further, holding that, even if a debtor's belief in his right to dispose of the collateral was an unreasonable one, it was nevertheless sufficient to foreclose any finding of a willful and malicious intent. "But, it is immaterial whether the Bankrupt's belief was reasonable. The question is whether he had a good faith belief that he was merely a co-signer on the note. A good faith belief, even though unreasonable, precludes a wilful and malicious intent." *Id.* at 293.

▮ Examining the facts of the action in the light of this "rigid subjective standard"[14] compels the court to conclude that, with respect to the crops and grain, the debtor David L. Homer might well have entertained a good faith belief that he might dispose of them on his own account without violating the terms of the governing security agreement. As noted above, that instrument provides in one place that sale of the crops without consent of the secured party is a default in performance. On the other hand, however, the security agreement, as above emphasized, provides for "substitution" of collateral, a provision which can reasonably be read to imply that the particularly described collateral may be sold or otherwise disposed of so long as the collateral position of the plaintiff is otherwise adequately maintained. And, in yet another place, the abovementioned provision for permission of the secured party as a prerequisite to sale of the collateral is negated, calling for permission to be given instead by some unidentified "Bank." And the agreements between the parties on the general subject of crops and their disposition must necessarily be read to include a provision that some of the proceeds should go to the debtors for their labor and expenses of planting, cultivation and harvest and, in fact, to devote all of such proceeds to that purpose, if necessary.[15]

If there had been a showing that the proceeds of the crop were greatly in excess of the compensation for the debtors, and their expenses, then the evidence, even under the "rigid subjective standard" which controls the issue, might well be held to command a different result. But there is really nothing of any definitive character which has been offered to contradict the general testimonial protestations of the defendants that the harvest was insufficient, primarily because of adverse weather conditions, to enable them to impart any more proceeds to the plaintiff than have previously been imparted. The chart of possible yields which the plaintiff has adduced in evidence and which has been summarized above in the findings of fact is predicated on bases which are wholly speculative and conjectural—that certain bushels per acre

---

12. See note 11 *supra*.

13. "Nowhere in the record is it reflected that the bankrupt should have been aware of the after-acquired property clause, except technically by the terms of the agreement itself ..." *In re Bellmer*, Civil Action No. 79–6042–CV–SJ (W.D.Mo. May 9, 1980).

14. "In consequence of the publication of this new standard, the district courts, even in cases originating under the old Bankruptcy Act, have commenced to apply a rigid subjective standard ..." *In re Lewis*, supra note 12, at 48.

15. To hold otherwise would mean that the contracts were unconscionable contracts of adhesion, requiring the debtors to work solely for the benefit of the plaintiff without any remuneration whatever.

were in fact the yield and were sold for a certain price per bushel and that the product of that multiplication cannot reasonably and in good faith be reduced or equalled by the cost and expenses of producing the gain. None of these postulates finds any support in the actual evidence. It is not shown that there was in fact a certain yield per acre or that a certain price per bushel was obtained. The testimony of the defendant David L. Homer in this regard is wholly a set of approximations, unsupported by documentation or the particularized detail of a firm and unshakable memory. The only precision and certainty in the evidence which has been offered is the firm and unequivocal assertion of David L. Homer that the plaintiff received all of that to which he was entitled under the agreements between them and according to the net proceeds yielded by the crops. Viewing that uncontradicted assertion in the light of the "rigid subjective standard" above expatiated and also in the absence of any certain showing that Homer received more than his entitlement, the court can only conclude that the disposition of the crops did not constitute "wilful and malicious conversion" within the meaning of § 523(a)(6) of the Bankruptcy Code.

■ These principles also apply with at least equal force to the allegations of willful and malicious conversion of the other chattels—the fertilizer and diesel fuel, the use of which in the course of farming operations must necessarily be contemplated, and the bundles of hay which David L. Homer has clearly and without contradiction testified have been fully destroyed by rot and burning. Further, in respect of these articles, the evidence does not clearly show the existence of an enforceable security interest in favor of the plaintiff.[16]

Accordingly, for the foregoing reasons, on the basis of the evidence adduced, this court concludes that there is no evidentiary basis for the issuance of a nondischargeability decree.

(3) *Implied Claims of Unexplained diminution of assets and failure to keep and preserve adequate books and records*

■ As observed in the foregoing sections, the defendants' explanations of the disposition of his assets are only general in nature. While they are sufficient, under the particular circumstances outlined above, to dispel and preclude a finding of willful and malicious conversion, the question must necessarily arise whether the plaintiff has introduced such evidence as to give rise to a duty on the part of the defendants to explain with particularity and by means of adequate records the disposition of these assets. If so, it may be said that the debtors' right to a general discharge has been tried by implication within the meaning of Rule 15(b) of the Federal Rules of Civil Procedure[17] and in light of their duty under § 727 of the Bankruptcy Code to explain the diminution of their assets to meet liabilities and their duty to keep and preserve such records which will reflect their financial history and transactions.[18] But under Rule 4005 of the Rules of Bankruptcy Procedure, a plaintiff objecting to discharge bears the burden of making a prima facie case before the debtors have the burden of producing books and records which support their gen-

---

**16.** The court was not presented with documentary evidence which would support any contention of a valid or perfected security interest in these items.

**17.** "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings ..." Rule 15(b), F.R.Civ.P.

**18.** "The court shall grant the debtor a discharge unless ... the debtor has failed to explain satisfactorily, before determination of denial of dis-

charge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." Section 727(a)(5) of the Bankruptcy Code. "The court shall grant the debtor a discharge unless ... the debtor has ... failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." Section 727(a)(3) of the Bankruptcy Code.

eral contentions that the assets have been disposed of in a particular manner.[19] And, as noted above, the plaintiff has not established that the dissipated assets reached any particular level at any given point. Rather, his suggestion that some $94,000 in assets has disappeared can be arrived at only through the impermissible process of piling inference on inference.[20] This must necessarily be regarded as an insufficient predicate upon which to base a denial of discharge for failure to explain with particularity the disposition of assets or to keep and preserve such books and records as will offer such a particular explanation.

The court cannot offer the decision at bar as a general commission for debtors to escape, through the artifice and stratagem of taking bankruptcy, their lawful duty to account to owners for the disposition of their property. Such dishonesty, if proven, cannot merit a discharge in bankruptcy. But, when the magnitude of any disposition can be shown only by supposition and the parties' rights and obligations are defined only by a patchwork of homedrawn instruments, some of which have been inappropriately adapted from forms intended to identify parties other than those to the agreement, the court can do little to rescue the complaining party from its own malice. Accordingly, it is concluded that the court cannot deny the defendants' discharges in bankruptcy on the basis of the evidence presented to it.

### The defendants' counterclaim

■ The defendants' counterclaim for conversion became property of the bankruptcy estate when the debtor filed their petition for relief under title 11 of the United States Code. See § 541 of the Bankruptcy Code. Thereafter, the claim was assertable only by the trustee in bankruptcy unless, after the trustee's refusal to prosecute the claim, the court should restore its ownership to the debtors.[21] That is not shown to be the case at bar. The debtors contend that they have a right to prosecute the claim insofar as they may claim it as exempt property under the Bankruptcy Code.[22] The governing statutory scheme does not support this contention.[23] Accordingly, the counterclaim must be dismissed for lack of the defendants' standing to prosecute it.

### The timing of this decision

■ The authorities are clear to the effect that jurisdiction attaches at the time of the filing of an action and its extent and character is defined by the law which is in

---

19. "At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving his objection." Rule 4005 of the Rules of Bankruptcy Procedure. It is necessary, before a debtor is required to explain the diminution of assets, to establish that assets existed which are not explained by general considerations. Otherwise, the debtor is faced with the nigh impossible task of proving a negative.

20. The conclusion that over $90,000 in damages were incurred involves, first, an inference not warranted by the evidence to the effect that a certain per bushel price was obtained, and second that so many bushels were harvested. Neither fact is evidentiary; both are inferential. "Inferences may be drawn only from facts in evidence. They may not be based upon mere speculation, guess, or conjecture as to what might have happened ... (T)he pyramiding or imposition of one inference upon another to establish the facts necessary to (a party's) case ... is not permissible and amounts to mere speculation." *Tyrrell v. Dobbs Investment Co.*, 337 F.2d 761, 765 (10th Cir.1964).

21. "Although the particular chose in action vests in the trustee ..., if the trustee disclaims interest therein because it is burdensome property, and refuses to institute a suit based on the chose in action, or because of inaction in reference to the chose in action may be said to have disclaimed his interest therein, the title revests in the bankrupt and he may prosecute a suit based thereon." 1A Collier on Bankruptcy para. 11.10, p. 1205 (1976). There is no statement or showing in the counterclaim at bar that the trustee has in any manner disclaimed an interest in the action for alleged conversion of property.

22. Section 522(g) of the Bankruptcy Code permits a debtor to exempt certain property which may be recovered by a trustee. But, unless the trustee disclaims any interest, there appears to be no statutory warrant for the debtor's assertion of the chose in action.

23. See, e.g., section 522(h) of the Bankruptcy Code.

effect at that time.[24] At the time of the filing of the complaint at bar, March 30, 1983, in the absence of any jurisdictional statute conferring jurisdiction on the bankruptcy court, the bankruptcy court was possessed of its inherent, nonstatutory jurisdiction to administer and distribute the estate in its possession and to determine which debts are discharged by such administration and distribution. *Matter of Brown,* 26 B.R. 119 (Bkrtcy.W.D.Mo.1983).

The scope and effectiveness of such jurisdiction was soundly founded upon the letter of venerable and fundamental Supreme and appellate court decisions.[25] Yet, dischargeability decisions based upon allegations of fraud and conversion have many undeniable indicia of constituting actions arising under state law which the Supreme Court ruled in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), cannot be determined in non-Article III courts. The rights and liabilities are defined by state law and, but for the bankruptcy, the parties would have a right to trial, by jury if requested, and determination in a state court.[26] And "private" as opposed to "public" rights are adjudicated. Nor can the expedient by which a state law cause of action is absolved into federal law and recast as a federal claim provide a pretext for non-Article III adjudication if the purpose of Article III is to be fulfilled.[27]

Further, as of the time of a completion of the trial in this action, February 2, 1984, there was a possibility that the jurisdiction of the bankruptcy court, at the scheduled end of the transition period on March 31, 1984, might be redefined in such a manner as at once to have a retroactive effect and to make it clear whether bankruptcy court jurisdiction extended to matters such as those at bar.[28] But subsequent history has

---

**24.** "The time of filing suit is, of course, the critical date." *Hawes v. Club Ecuestre El Comandante,* 598 F.2d 698, 703 (1st Cir.1979). "The general rule is that a court's acquisition of jurisdiction over a case depends on the facts existing at the time its jurisdiction is invoked ... And where, in view of the facts existing at the beginning of the proceedings, the court has acquired jurisdiction over a case, that jurisdiction is ordinarily not ousted by subsequent events." 20 Am.Jur.2d *Courts* section 142, p. 491 (1965). "A court's jurisdiction in a case depends upon the facts which exist at the time the jurisdiction was invoked, i.e., at the time of the commencement of the action ... That jurisdiction is not ousted by subsequent events." *In re Stahl, Asano, Shigetomi Associates,* 36 B.R. 179, 182 (Bkrtcy.D.Hawaii 1983).

**25.** See cases and authorities cited at 26 B.R. 119, 120. See also *Matter of E.C. Bishop & Son, Inc.,* 32 B.R. 534, 537 (Bkrtcy.W.D.Mo.1983), and cases there cited.

**26.** In making the dischargeability determination, the bankruptcy also adjudicates actions, which like the contract action in the *Marathon* case, involve rights "created by state law ... independent of an antecedent to the ... petition that conferred jurisdiction upon the bankruptcy court. Accordingly, Congress' authority to control the manner in which that right is adjudicated, through assignment of historically judicial functions to a non-Art. III 'adjunct' plainly must be deemed at a minimum." 102 S.Ct. at 2878.

**27.** This may well be done, lawfully and constitutionally, as this court has previously noted in *Matter of Kakolewski,* 29 B.R. 572 (Bkrtcy.W.D. Mo.1983), to the effect that summary jurisdiction may be broadened by a broader definition of the estate. Further, "(C)ongress has, of course, power to confer upon the bankruptcy court jurisdiction to adjudicate the rights of trustees to property adversely claimed. In matters relating to bankruptcy its power is paramount. Hence, even if the property is not within the possession of the bankruptcy court, Congress can confer upon it, as upon any other lower federal court, jurisdiction of the controversy, by conferring jurisdiction over the person in whose possession the property is." *Taubel-Scott-Kitzmiller Co. v. Fox,* 264 U.S. 426, 430, 431, 44 S.Ct. 396, 398, 68 L.Ed. 770 (1924). Thus, the jurisdiction of the bankruptcy court is expansive and expandable. But the question which must occupy the central focus of attention at this point is how far such jurisdiction may be exercised without engaging the "federal judicial power" within the meaning of Article III of the national Constitution. It would appear unlikely that some substantial contact with such power could be avoided where the recast state law claim is one on which a right to jury trial is vouchsafed by the federal Constitution. See and compare *Matter of Kakolewski, supra.*

**28.** The retroactive effect of a new jurisdictional statute appeared possible because of the provision in section 409(a) of P.L. 95–598 for transfer of all cases pending on April 1, 1984, to the new court of bankruptcy.

not borne out this expectation but rather has placed in temporary doubt the power of the bankruptcy court to function. Nevertheless, this court has recently reaffirmed its power to determine cases having their genesis prior to June 28, 1984, on the basis of its holdover status.[29] And the applicable jurisdiction, as above observed, dates back to the theory of jurisdiction expatiated in *Matter of Brown, supra.*

Accordingly, for the foregoing reasons, it is hereby

ORDERED, ADJUDGED AND DECREED that the plaintiff's within complaint be, and it is hereby, denied. It is further

ORDERED, ADJUDGED AND DECREED that the defendants' counterclaim be, and it is hereby, dismissed without prejudice to its merits.

**29.** "The current power of the bankruptcy court to act ... is derivative of the power which existed at the commencement of the action. It is clear under the current situation enveloping the bankruptcy court that its power to act is a question which is slightly different than its jurisdiction. As of this date, it is contended by some that the added tenure granted to bankruptcy judges by the Bankruptcy Amendments and Federal Judgeship Act of 1984 is unlawful and that exercise of any power under that statute can only result in an order or judgment which is null and void. This is the position of the Administrative Office of United States Courts, which has insisted that former bankruptcy judges, whose tenure, they insist, ended as of June 27, 1984, instead exercise judicial authority only as United States magistrates. On the other hand, others contend that the reappointment effected by the Bankruptcy Amendments and Federal Judgeship Act of 1984 is not only effective but also renders any actions undertaken in bankruptcy cases by United States magistrates null and void. But this court need not resolve that dispute with respect to the actions at bar, which were filed long before the lapsing of the transition statute on June 28, 1984, created the seeming hiatus in the tenure of bankruptcy judges. As to this action, therefore, the undersigned simply sits in the status of a holdover judge until a successor is appointed. Both the relevant portion of the transition statute and general legal principles support this basis of judicial power. It is to be noted in this regard that the relevant portion of the transition statute, section 404(b) of Public Law 95–598, originally purported to extend the term of a bankruptcy judge to 'March 31, 1984, *or when his* *successor takes office.*' (Emphasis added.) The successive Congressional extensions of the date of March 31, 1984, properly construed according to time-honored canons of construction, did not delete the language and effect of the initial minimal extension to the time when a successor lawfully takes office. For the form of the successive extensions was simply to replace 'March 31, 1984,' with subsequent dates, finally ending on June 27, 1984, and not to delete the language, 'or when his successor takes office.' In respect of each extension, a subsequent section provided that the term of a sitting bankruptcy judge should 'expire on' the date on which the extension was to end. But this did not purport to end his holdover status as contained in the language, 'or when his successor takes office.' Accordingly, according to the lasting effect of the transition statute, the undersigned, as to the action at bar, continues to sit as a holdover judge .... (U)nder the general law, even in the absence of such a statutory provision, a judge whose term of office runs out ordinarily retains power to act, *de facto* if not *de jure,* until his successor is appointed, with respect to actions filed prior to the end of the term of office. There is authority that even in the absence of statute it is the right and duty of an incumbent judge to hold over and exercise the duties and functions of the office until his successor is appointed ....' 16 Am.Jur.2d *Judges* section 16, pp. 105–106 (1969). This theory of *de facto* power of the sitting bankruptcy judges finds support in the very recent order issued in *Matter of Walker,* Civil Action No. 83–6005–CV–SJ (W.D.Mo. July 12, 1984), by the distinguished district judge of the St. Joseph Division, the Honorable Howard F. Sachs.