In re James Ray HOLMAN and Shirley Ann Holman, Debtors.

Paul A. MOORE, Plaintiff,

v.

James Ray HOLMAN and Shirley Ann Holman, Defendants.

Bankruptcy No. 84–00009(SE).

Adv. No. 84–0009(SE).

United States Bankruptcy Court,
E.D. Missouri,
Southeastern Division.

Sept. 4, 1984.

Daniel T. Moore, Poplar Bluff, Mo., for plaintiff.

Claude Arnold, Dexter, Mo., for debtors/defendants.

## MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

At issue before this Court is whether a certain disputed indebtedness owed Plain-

tiff by Defendant, James Ray Holman, is non-dischargeable. Although Defendant, Shirley Ann Holman, is a party Defendant, there is no allegation in Plaintiff's complaint from which any liability on her part to the Plaintiff may be inferred.

FACTS

These are the facts as the Court finds them:

1. In April, 1981, Plaintiff (Paul) and Defendant, James Ray Holman (James), orally agreed to form a partnership to engage in the business of landgrading. Under this arrangement, James was to supply his labor as a heavy-equipment operator and Paul was to do the administrative work and, apparently, to supply most of the capital.

2. On May 16, 1984, Paul and James formalized their arrangement in a written partnership agreement. In this document, James was to receive twenty per cent (20%) of the "total collections up to and including $100,000.00" and ten per cent (10%) "of all collections over $100,000.00." Paul was to receive one per cent (1%) of "total collections for administrative work". Apparently, Paul and James were also to share the profits equally.

This agreement also

(a) requires that all "monies received from the partnership operation will be in the names of James and Paul";

(b) prohibits either partner from signing the other's name;

(c) requires each partner to give the other notice of any funds received by that partner, and

(d) prohibits either partner from expending partnership funds except for "normal operations and paying off indebtedness".

3. Around this point in time or shortly thereafter, James began to feel that Paul was "shortchanging" him. In particular, Paul received payment from a job in Texas and, instead of paying James his percentage and reimbursing his out-of-pocket expenses, Paul paid over the entire amount on certain delinquent partnership debts.

Paul admitted doing this but claimed the agreement permitted him to do it.

James also complained at the hearing that Paul had traded in a partnership trailer as part of the purchase of a new trailer which Paul then had titled solely in his name. Paul also signed James' name to the loan documents. Paul admits all of this but claims that (1) he had authority from James to sign his name to these documents and (2) he intended the new trailer to be partnership property.

4. In the fall of 1983, James decided to "recoup" these along with other supposed losses from Paul. James accepted a landgrading job in Marks, Mississippi, but did not give Paul any advance notice of this employment. He then opened an account locally and deposited in that account an initial job payment of $3,150.00. The account was titled in James' and Paul's names and either could disburse funds from it.

Paul testified that when James finally told him of this particular job, James gave him a false name for the person with whom James had contracted the job and also told him that no payment would be received on this job until its completion. James testified that he gave Paul the name of the principal owner of the contractee, Waco Construction Company, Inc. (Waco), and denied telling Paul that no funds would be received until the job's completion. James testified that he told Paul of this account shortly after he opened it. Paul did not contradict this.

5. From the initial deposit, James paid various amounts for labor and other expenses and also wrote himself two checks, one for $400 with the notation "for parts" and the other for $620 with the notation "for labor".

6. Waco paid James another progress payment in the amount of $11,195.43. James deposited this check on December 19, 1983, and then wrote two checks, one for $874.71 to Sayle Oil Co., and the other to himself for $5,298.41 with the notation "for labor".

7. A day or two later, Paul came to Marks, Mississippi. After having a heated conversation with James, Paul withdrew the remaining balance in the local account, $5,605.35, and took all of the partnership equipment back to Missouri. At that point, at least for James, the partnership terminated. Paul has retained possession of all of the partnership property.

CONCLUSIONS

Paul centers his complaint upon the $6,318.41 which James paid over to himself in November and December, 1983, from the Mississippi bank account. Although Paul makes no reference to any particular subsection of 11 U.S.C. 523(a), the nondischargeability statute, subsections (4) and (6) of that statute are the most relevant.

1. *Is the alleged debt non-dischargeable under section 523(a)(4) of the Bankruptcy Code?*

Section 523(a)(4) states:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

(a) *Is this a liability for "fraud or defalcation while acting in a fiduciary capacity"?*

Section 358.090, *R.S.Mo.* (identical to section 9 of the Uniform Partnership Act) states, in part:

1. Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority. . . .

Section 358.210, *R.S.Mo.* (identical to section 21 of the Uniform Partnership Act) further states:

1. Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

2. This section applies also to the representatives of a deceased partner engaged in the liquidation of the affairs of the partnership as the personal representatives of the last surviving partner.

However, while under partnership law, the relationship between partners is a fiduciary relationship, *Schroer v. Schroer*, 248 S.W.2d 617 (Mo.1952), courts interpreting the predecessor statutes to the present section 523(a)(4) did not give the term "fiduciary capacity" the same broad meaning. Instead, they held that partners were not "fiduciaries" within the meaning of these statutes, 3 *Collier on Bankruptcy*, section 523.14, pp. 100 and 101 (15th Ed.) and the cases cited in footnote 12 therein. The reason why courts construed the term "fiduciary" so narrowly was because the term "defalcation", unlike fraud, was construed to include not only conduct involving bad faith or intentional wrong doing but also the mere failure to account for funds entrusted to the fiduciary, *Carlilse Cashway, Inc. v. Johnson*, 691 F.2d 249, 256 (6th Cir.1982); *Central Hanover Bank v. Herbst*, 93 F.2d 510 (2d Cir.1937). After reviewing the relevant legislative history of the present Bankruptcy Code and the cases construing the term "fiduciary capacity" as used in the present section 523(a)(4), the Court concludes that Congress did not intend when it enacted the present Bankruptcy Code to expand the meaning of this term to include ordinary agency relationships. In reaching this conclusion, the Court is aware of the holding of the Bankruptcy Court for the Eastern District of Michigan in *In re Kraus*, 37 B.R. 126 (1984). In that case, the court held that the above-quoted provisions of the Uniform Partnership Act

created a "fiduciary" relationship within the meaning of section 523(a)(4). In so doing, the Michigan bankruptcy court stated:

The Uniform Partnership Act established an *express trust* for which each partner acts as trustee. The trust is created before the act creating the debt and without any reference to that debt. . . .

*In re Kraus, supra,* at p. 130.

The Michigan bankruptcy court in reaching this above-quoted conclusion, overlooks the old United States Supreme Court case of *Chapman v. Forsyth,* 2 HOW. 202, 43 U.S. 202, 11 L.Ed. 236 (1844). In that case, the Supreme Court first clarified the meaning of the term "fiduciary" as used in a bankruptcy statute similar to section 523(a)(4):

The second point is, whether a factor, who retains the money of his principal, is a fiduciary debtor within the act.

If the act embrace such a debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act.

The cases enumerated, "the defalcation of a public officer," "executor," "administrator," "guardian," or "trustee," are not cases of implied but special trusts, and the "other fiduciary capacity" mentioned, must mean the same class of trusts. The act speaks of technical trusts, and not those which the law implies from the contract. A factor is not, therefore, within the act.

This view is strengthened and, indeed, made conclusive by the provision of the fourth section, which declares that no "merchant, banker, factor, broker, under-

writer, or marine insurer," shall be entitled to a discharge, "who has not kept proper books of accounts." In answer to the second question, then, we say, that a factor who owes his principal money received on the sale of his goods, is not a fiduciary debtor within the meaning of the act.

*Chapman v. Forsyth, supra* 2 How. at p. 207.

■■■ This interpretation was later approved by the Supreme Court in *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). Clearly then, the term "fiduciary" as used in 11 U.S.C. 523(a)(4) is limited to the class of fiduciaries including trustees of specific written declarations of trust, guardians, administrators, executors, or public officers and, absent special considerations, does not extend to the more general class of fiduciaries such as agents, bailees, brokers, factors, and partners. Thus, the alleged indebtedness at issue in this case is not a debt for fraud or defalcation while acting in a fiduciary capacity.

■■■ (b) *Is this a liability for embezzlement or larceny?*

Embezzlement under this section is defined as

the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come, and it requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud.

*United States Life Title Insurance Company of New York v. Dohm,* 19 B.R. 134, 138 (N.D.Ill.1982).

Larceny is

the fraudulent and wrongful taking and carrying away the property of another with intent to convert such property to his (the taker's) use without the consent of the owner. As distinguished from embezzlement, the original taking of the property was unlawful.

3 *Collier on Bankruptcy,* section 523.15, p. 107 (15th Ed.).

Obviously, James could not have committed larceny in distributing the funds to himself since, as partner, he was lawfully entitled to have possession of them initially.

Further, James could not have committed embezzlement of these funds. A partner cannot be guilty of embezzling partnership property, *State v. Ossendorf,* 357 Mo. 366, 208 S.W.2d 209 (1948); *Annotation,* 82 A.L.R.3rd 822, 829.

Hence, section 523(a)(4) of the Code affords no basis for Plaintiff's non-dischargeability complaint.

2. *Is the alleged debt non-dischargeable as a wilful and malicious conversion of Plaintiff's property under 11 U.S.C. 523(a)(6)?*

■ Liabilities for wilful and malicious conversions of property are included in the scope of section 523(a)(6) which generally makes non-dischargeable liabilities for wilful and malicious injuries to the property of another, *see* Cong.Rec. H 11,095–6 (Sept. 28, 1978); S 17,412–13 (Oct. 6, 1978).

However, a partnership cannot maintain an action for conversion against a partner who takes partnership property, *Basset v. American Meter Co.,* 20 App.Div.2d 956, 249 N.Y.S.2d 815 (1964); Crane and Bromburg, *Law of Partnership,* p. 400 (West Publishing Co. 1968). Thus, James, in distributing the funds to himself, did not convert the property interest of anyone else.

Moreover, James' actions were not wilful or malicious as those terms are used in section 523(a)(6) of the Code. James took the $6,318.41 of partnership funds in the belief that the partnership owed him this amount for his agreed-upon percentage for previous jobs and for his out-of-pocket expenses. Paul concedes that James was not paid his percentage from the receipts of the previous job in Texas. Whether or not James took more than he may be entitled to upon a final accounting between the parties is immaterial.

Thus, Paul's dischargeability complaint has no merit. A separate order consistent with this opinion will be entered.