**In re Richard Marshall TAYLOR, Jr., Debtor.**

**W. Donald CLARK, Plaintiff,**

v.

**Richard Marshall TAYLOR, Jr., Defendant.**

**Bankruptcy No. 83–01344–A.**
**Adv. No. 84–0088–A.**

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

March 19, 1986.

See also 54 B.R. 882.

Diana M. Perkinson, Perkinson & Perkinson, Roanoke, Va., for debtor.

Helen P. Parrish, Charlottesville, Va., for plaintiff.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Bankruptcy Judge.

This matter is here on a creditor's complaint to determine the dischargeability of a debt under sections 523(a)(2)(A) and 523(a)(4) of the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 101–151326 ("the Code"). After oral determination of the complaint in favor of the creditor on the basis of his section 523(a)(4) claim for fraud and defalcation, the Court on its own motion indicated that it would reconsider the matter and issue a written opinion.

The issues presented are (1) whether the debtor obtained money or an extension of credit through false pretenses, false representations, or actual fraud under section 523(a)(2)(A) of the Code, and (2) whether the debtor committed a fraud or defalcation while acting in a fiduciary capacity or embezzled funds under section 523(a)(4).

The facts of the case are not seriously disputed. Richard M. Taylor, Jr. ("the debtor") filed a petition under Chapter 7 of the Code on November 18, 1983. Schedule

A–3 of the petition listed a debt of $5,000.00 owing to W. Donald Clark ("Clark") on "open account" for the "sale of [a] horse represented by a post-dated check." The horse, a mare named Lamar B., had been co-owned in equal shares by the debtor and Clark.

Clark and the debtor had agreed to sell Lamar B. as part of a "package" sale of three horses to Cavalier Thoroughbred Farm, Inc. ("Cavalier Thoroughbred"). The contract of sale, dated February 13, 1982, recited consideration of $10,000.00 for Lamar B.; $10,000.00 for Dangling Maid, owned solely by the debtor; and $20,-000.00 for Kitten Two, owned solely by a third party. The total contract price of $40,000.00 was scheduled to be paid to the debtor in four installments of $10,000.00 each, the first installment to be made on or about the date of the signing of the contract and the remaining installments to follow at thirty-day intervals. By agreement, the debtor was to collect the installments and pay over to Clark and the third owner their shares of the money.

The debtor himself was entitled to approximately $17,000.00: $5,000.00 for his half interest in Lamar B., $10,000.00 for Dangling Maid, and approximately $2,000.00 for a commission on the sale of Kitten Two. Some time after the execution of the contract, the debtor gave Clark a post-dated check for $5,000.00 on the understanding that the check would not be presented for payment until the April 15, 1982 date on the check. The third installment was scheduled under the contract to be delivered to the debtor on or about April 14, 1982.

The debtor received the first two installments of $10,000.00 each and used them to defray the expenses of his horse-breeding and boarding business. By a letter dated March 16, 1982, the debtor directed Cavalier Thoroughbred to make payment of the April 14 installment directly to the debtor's

bank, The Bank of Greene. Evidently this installment was to be applied towards the debtor's obligations to the Bank. The third installment was in fact received by the Bank, although several weeks later than originally scheduled.

After April 15, Clark made several inquiries of The Bank of Greene to see if sufficient funds were available in the debtor's checking account to honor the $5,000.00 check. Each time, Clark was informed that the check should not be presented. When Clark and then Clark's attorney contacted the debtor about the third installment, the debtor incorrectly represented that the installment had been withheld by Cavalier Thoroughbred because of a contract dispute.[1] The debtor did not pay Clark any of the $5,000.00 and listed the debt on his petition in bankruptcy.

Clark filed a complaint to determine the dischargeability of the $5,000.00 debt on February 13, 1984. The complaint raises issues under sections 523(a)(2)(A) and 523(a)(4) of the Code, and these issues are addressed below.

1. Obtaining money or an extension of credit through false pretenses, false representations, or actual fraud under section 523(a)(2)(A).

Section 523(a)(2)(A) of the Code states:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition....

11 U.S.C. § 523(a)(2)(A). *In re Carneal,* 33 B.R. 922 (Bankr.E.D.Va.1983), presents a five-part test for determining a claim of nondischargeability under section 523(a)(2)(A):

---

**1.** In fact, it was the fourth and final installment that had been withheld. Taylor sued Cavalier Thoroughbred to recover that installment and obtained an $8,500.00 settlement. One third of

the settlement went to Taylor's attorney for her fees; the remainder of the funds were garnished by the former owner of Kitten Two.

(1) the debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained the alleged loss and damage as a result of the representations having been made.

33 B.R. at 924–25. Each of these elements must be shown by clear and convincing evidence. *Brown v. Buchanan*, 419 F.Supp. 199, 203 (E.D.Va.1975). The exceptions set forth in section 523(a)(2) must be strictly construed. *In re Handy*, 35 B.R. 912, 914 (Bankr.E.D.Va.1983).

Assuming *arguendo* that Clark offered evidence at trial to satisfy the first four parts of the test, the fifth hurdle bars relief under section 523(a)(2)(A). Clark concedes in his brief that the debtor had already received the third installment from Cavalier Thoroughbred when he represented to Clark that the funds had not been paid. Clark claims that he sustained loss as a result of having relied on the debtor's oral and written representations regarding the third installment. But the rule is clear that once the money or property is in a debtor's hands, "subsequent misrepresentations will have no effect upon the discharge of the debt." 3 *Collier on Bankruptcy* ¶ 523.08[4], at 523–49 (15th ed. 1985) [hereinafter cited as *Collier*]. The debtor had received the third installment before he made the alleged false representations. Accordingly, Clark cannot prevail on a claim of false representations or false pretenses under section 523(a)(2)(A).

2. Fraud or defalcation while acting in a fiduciary capacity or embezzlement under section 523(a)(4).

Section 523(a)(4) of the Code states:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. . . .

11 U.S.C. § 523(a)(4).

■ The threshold requirement for nondischargeability under section 523(a)(4) for fraud or defalcation is a finding that the debtor was a fiduciary of the creditor-plaintiff. *In re Bailey*, 35 B.R. 224, 227 (Bankr. E.D.Va.1983). The instant debtor contends that no such fiduciary relationship existed, claiming that fraud or defalcation requires proof of an express or technical trust and that section 523(a)(4) does not apply to trusts imposed or implied by law or arising out of contract. This statement of the law is sound. *See, e.g., In re Weidman*, 18 B.R. 249, 251–52 (Bankr.E.D.Va.1982). It has been stated that:

[t]he qualification that the debtor be acting in a fiduciary capacity has consistently, since its appearance in the Act of 1841, been limited in its application to what may be described as technical or express trusts, and not to trusts *ex maleficio* that may be imposed because of the very act of wrongdoing out of which the contested debt arose.

3 *Collier* ¶ 523.14[1][c], at 523–108 (footnote omitted). The debtor claims that "at most" the relationship between him and Clark was a principal-agent relationship. Section 523(a)(4) does not apply to the frauds or defalcations of agents, brokers, or partners "unless there be some additional fact" sufficient to create a fiduciary responsibility. 3 *Collier* ¶ 523.14[1][c], at 523–109 to 523–110; *see also In re Paley*, 8 B.R. 466, 469 (Bankr.E.D.N.Y.1981). The debtor points out that counsel for Clark admitted during closing argument at trial that no express trust was imposed on the funds in the debtor's hands. Under the general rule then, no fiduciary relationship could have existed under section 523(a)(4) of the Code.

■ Clark concedes that section 523(a)(4) generally requires that there be a technical or express trust creating a fiduciary relationship. However, Clark points to an apparent exception to the general rule. In *In re Kraus*, 37 B.R. 126 (Bankr.E.D.Mich. 1984), the court held that an express trust arose by operation of law because the debtor and creditor were partners and state law

imposed fiduciary duties on partners in their dealings with each other. 37 B.R. at 130. Michigan's version of the Uniform Partnership Act "established an *express trust* for which each partner acts as trustee." *Id.* (emphasis in original). The *Kraus* court found that the debtor, having committed a defalcation while in a partnership fiduciary capacity, should be denied a discharge under section 523(a)(4) of a state court judgment against him. *Id.* at 131. Clark seizes upon the *Kraus* ruling and argues that the relationship between him and the debtor should be characterized as a partnership.

If Clark and the debtor were indeed partners, *Kraus* would support Clark's position since Virginia has also adopted the Uniform Partnership Act and the controlling section of the Virginia Code is identical to the Michigan version of the same section. *Compare* 1950 Code of Virginia § 50–21(1) (Repl.vol.1980) *with* Mich.Comp.Laws Ann. § 449.21. But Clark's argument is less than persuasive for two reasons. First, a Missouri bankruptcy court opinion that appeared shortly before Clark's brief was filed calls the *Kraus* holding into question. Second, Clark fails to garner convincing evidence to demonstrate the existence of a partnership between himself and the debtor.

In *In re Holman,* 42 B.R. 848 (Bankr.E. D.Mo.1984), the court cited section 358.210 of the Missouri Code (adopting section 21 of the Uniform Partnership Act) and held that "while under [state] partnership law, the relationship between partners is a fiduciary relationship," under section 523(a)(4) the relationship between partners is not a fiduciary relationship. 42 B.R. at 850. The *Holman* court reasoned that Congress did not intend the expansion of the term "fiduciary capacity" to include ordinary agency or partnership relationships when it adopted the Code. *Id.*

The *Holman* court discussed *Kraus* but declined to follow it, indicating that the Michigan bankruptcy court in *Kraus* had overlooked *Chapman v. Forsyth,* 43 U.S. (2 How.) 202, 11 L.Ed. 236 (1844). 42 B.R.

at 850. In *Chapman,* the Supreme Court delimited the meaning of the term "fiduciary" found in a predecessor of Code section 523(a)(4). The relevant question before the Court in *Chapman* was whether a factor who retained his principal's money was a "fiduciary debtor" within the Bankruptcy Act of 1841. The Court held that a factor was not a fiduciary because the statute referred to technical trusts, not implied trusts:

If the act embrace[s] [a factor's] debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act.

43 U.S. at 208. Nearly one hundred years later, Justice Cardozo noted that the *Chapman* rule had been applied by the Court "in varied situations with unbroken continuity." *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 154, 79 L.Ed. 393 (1934).

Support for Clark's assertion that he and the debtor were partners is scant. Clark does not direct the Court's attention to any case law. Instead, Clark reprints the definition of "partnership" found in *Black's Law Dictionary* and reasons as follows:

The transaction concerning the sale of Lamar-B [sic], since it was to be the last of a series between the parties, was essentially the liquidation of a partnership. Taylor was in control of the proceeds of the sale of Lamar-B and, therefore, was required by Virginia state law to hold the proceeds as a trustee.

At first glance, Clark's argument, set forth in his brief, appears applicable. Clark's and the debtor's business dealings began when the debtor sold Clark an interest in

the breeding rights to a stallion owned by the debtor. Then, in separate transactions, Clark bought two mares from the debtor and returned a half interest in each horse to the debtor in return for boarding services. When the debtor sold these mares, Clark received cash and a credit towards the purchase of Lamar B. Clark also received a credit representing the balance of his interest in the breeding rights to the stallion. This series of business transactions culminating in the sale of Lamar B. resembled a partnership in that Clark contributed capital and the debtor contributed services to an enterprise designed to produce a profit for both men. But in order to form a partnership in Virginia, an agreement or contract between the parties to form a partnership is essential. *Coons v. Coons*, 106 Va. 572, 578, 56 S.E. 576 (1907). Clark has not alleged the existence of such an agreement or contract. Before Clark can properly characterize the sale of Lamar B. as the winding up of a partnership, he must prove that a partnership existed.

■ Assuming that a partnership did exist, the Court finds the *Holman* opinion persuasive and holds that the existence of a partnership does not *per se* create a fiduciary relationship within the meaning of section 523(a)(4). Since Clark relies solely on the argument that he and the debtor were partners, he has not demonstrated the existence of a fiduciary relationship for fraud or defalcation. Therefore the threshold test for nondischargeability under section 523(a)(4) has not been met.

The absence of a fiduciary relationship does not conclude the analysis under section 523(a)(4), however, because a fiduciary relationship is not required to make a debt resulting from embezzlement or larceny nondischargeable. The phrase "while acting in a fiduciary capacity" in section 523(a)(4) does not modify the words "embezzlement" or "larceny." 3 *Collier*, ¶ 523.14[3], at 523–116.

■ Fraudulent intent is the key to a finding of embezzlement or larceny. *In re Schwartz*, 36 B.R. 355, 358 (Bankr.E.D.N. Y.1984). Embezzlement involves the mis-appropriation of property by a person who comes into possession of the property lawfully or with consent of the true owner, while larceny involves the unlawful taking of property by a person without the owner's consent. 3 *Collier*, ¶ 523.14[3], at 523–116. Since in the case at bar the debtor's possession of the sale proceeds was contemplated by the sale agreement approved by Clark, the debtor's misapplication of the funds cannot be considered larcenous. The question remains whether the debtor embezzled funds due Clark.

The debtor maintains that as a preliminary matter the Court must find his conduct to have been "willful and malicious" within the meaning of section 523(a)(6) in order to find his debt nondischargeable for embezzlement under section 523(a)(4). The debtor cites *Matter of Adams*, 24 B.R. 252 (Bankr.W.D.Mo.1982), which applied the willful and malicious conversion standard of section 523(a)(6) to the plaintiff's claim under section 523(a)(4). 24 B.R. at 254. *See also In re James*, 42 B.R. 265, 267 (Bankr.W.D.Ky.1984) (legislative history implies that embezzlement under section 523(a)(4) includes willful and malicious conversion).

The *Adams* court noted that two standards have been applied by the courts to determine the presence of willful and malicious conversion. 24 B.R. at 254–55. One standard discussed by *Adams* and quoted by the debtor is "subjective." Cases employing the subjective standard "tend to forgive the conversion which is alleged unless there can be proven a specific 'intent to harm' the plaintiff." *Matter of Norton*, 21 B.R. 725, 728 (Bankr.W.D.Mo.1982). However, the *Adams* court applied an objective standard that, instead of focusing on the presence or absence of intent to harm (ill will or special malice), looks to whether the act of conversion was done deliberately and intentionally in knowing disregard of the plaintiff's rights. 24 B.R. at 255. An intent to convert leads to non-dischargeability under this standard despite an absence of a subjective intent by the debtor to harm the plaintiff. *Id.* at

254–55. In *Adams*, the debtor sold some hogs that had been entrusted to him by their owner. *Id.* at 253. The court found the requisite intent to convert and held the debt nondischargeable. *Id.* at 255. In his brief the instant debtor fails to discuss this second, lower standard and the fact that the *Adams* court relied on it.

The Richmond Division of the Eastern District of Virginia has adopted the objective standard of willful and malicious conversion employed by *Adams. In re Nuckols*, 47 B.R. 731, 734 (Bankr.E.D.Va.1985); *In re Hazelwood*, 43 B.R. 208, 213–14 (Bankr.E.D.Va.1984); *In re White*, 18 B.R. 246, 248–49 (Bankr.E.D.Va.1982). For a conversion to be willful it must be deliberate or intentional. *White, supra,* 18 B.R. at 248. To be malicious, a conversion must be " 'wrongful and without just cause or [excuse] even in the absence of personal hatred, spite or ill will.' " *Id.* (quoting 3 *Collier on Bankruptcy* ¶ 523.16[1] (15th ed. 1981)).

▇ If under *Adams* a section 523(a)(6) willful and malicious conversion analysis were to apply to Clark's claim of embezzlement under section 523(a)(4), the objective standard of willful and malicious conversion would also apply. Use of the objective standard is indicated by both *Adams* and the *White* line of cases in Virginia.[2] Intent to convert, not intent to harm, would then be the proper inquiry for the Court. Ill will towards the plaintiff would be irrelevant. Accordingly, *Adams* does not help the debtor. Clark need not prove that the debtor acted out of spite, ill will, or hatred in order to prove embezzlement within the meaning of section 523(a)(4).

The plaintiff must prove each element of a cause of action for embezzlement by clear and convincing evidence. *In re Graziano*, 35 B.R. 589, 593 (Bankr.E.D.N.Y. 1983) and cases cited therein. The elements of embezzlement are (1) appropriation of funds by debtor for his benefit, and (2) appropriation with fraudulent intent or by deceit. *Id.* at 595. Clark alleges that the debtor appropriated the funds from the third installment and converted them to his own use without notifying Clark. Evidence introduced at trial supports this allegation. Clark also alleges that the debtor's fraudulent intent can be inferred because

(1) the debtor spent the entire $20,000.00 represented by the first two installments for his own benefit even though he was entitled to a maximum of $17,000.00 ($5,000 for Lamar B., $10,000.00 for Dangling Maid, and $2,000.00 in commission for the sale of Kitten Two.); and

(2) the debtor deceived Clark and Clark's attorney when he twice represented that the third installment of $10,000.00 had not been paid and received when in fact it had been.

The fraudulent intent and misappropriation requisite for embezzlement may be proven by circumstantial evidence. *In re Graziano, supra,* 35 B.R. at 596.

Clark draws support from *Matter of Shuler*, 21 B.R. 643 (Bankr.D.Idaho 1982). Shuler, the debtor, sold a trailer he had received from the plaintiff on consignment. 21 B.R. at 644. Instead of paying the proceeds to the plaintiff-consignor, however, Shuler retained them in his general business account. *Id.* The court held the unpaid debt nondischargeable because an embezzlement had occurred. *Id.* The court in *Shuler* inferred an intent to deprive, reasoning that Shuler had an "affirmative duty" to pay the plaintiff his share of the proceeds from the sale of the trailer and Shuler's failure to pay was not "caused by circumstances or conditions beyond [his] control." *Id.* An intent to permanently deprive is not necessary to a find-

---

**2.** In *In re Vaughn*, 779 F.2d 1003, 3 Bankr.L. Rep. (CCH) ¶ 70,893, at 88,209–10 (4th Cir. Dec. 26, 1985), the Fourth Circuit Court of Appeals recently reaffirmed its holding in *Bennett v. W.T. Grant*, 481 F.2d 664 (4th Cir.1973), a case that was decided under the Bankruptcy Act of 1898. *Bennett* applied the objective standard to claims made under the predecessor to section 523(a)(6). *Vaughn* thus serves to refute the argument that Congress implicitly overruled *Bennett* when it explicitly overruled *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), a case upon which *Bennett* relied for support.

ing of embezzlement: "The fact that the intent is to deprive the rightful owner of the funds only temporarily and not permanently ... does not eliminate the element of intent." *Id.*

■ In his brief, the debtor all but admits that he intended to temporarily deprive plaintiff of his money: "[the debtor] might have been able to pay Clark from one of the early installments of the package sale had he not been forced to use this money for the continuing operation of his business...." The debtor would have us believe that the demands of his business justified his retention and use of funds that were not his, placing the risk of their loss on Clark.

The debtor considers *Shuler* distinguishable because he did not sell Lamar B. on consignment. Although true, this appears to be a distinction without a difference in the instant case. The debtor held legal title to Lamar B., but Clark had a one-half interest in the mare and the debtor was selling her for Clark's benefit as well as his own. Clark owned half of the horse and therefore had a right to half of the proceeds from the sale of the horse. The debtor did not seek or receive Clark's permission to use Clark's money to finance the debtor's business operations. Even though the debtor may have had pressing needs for the money, the usual exigencies of business are not the type of "circumstances or conditions beyond the control" of the debtor that would negate the inference of an intent to deprive Clark of his property.

Clark cites *In re Freeman*, 30 B.R. 704 (Bankr.W.D.La.1983) as additional support for the notion that the debtor had an affirmative duty to remit $5,000.00 of the proceeds of the package sale to him. Freeman, the debtor, was a Chrysler dealer who owed over $49,000.00 to Chrysler Credit Corporation ("CCC") on account of sales of cars financed by CCC. 30 B.R. at 706. After conferring with CCC about the debt, Freeman gave CCC a series of checks that were not backed by sufficient funds when written but were agreed to be satisfied by proceeds from future sales. *Id.* This arrangement is comparable to the one involving the $5,000.00 post-dated check that the instant debtor gave to Clark. Freeman sold several vehicles in the week immediately prior to the closing of his dealership, holding the proceeds in his business account. *Id.* Although Freeman "knew he had an affirmative duty at some time to remit those [sale proceeds] to CCC," he used a substantial amount of the money to pay off other creditors, to make his payroll, to pay his son $990.47 for "extra labor," and to give himself a $7,400.00 "bonus." *Id.* at 708.

The court found that Freeman had embezzled over $62,000.00 from CCC. 30 B.R. at 708. It should be noted that the finding of an intent to embezzle was based principally on the checks Freeman wrote to his son and himself. *Id.*

No evidence was offered in the case at bar to show that the debtor paid himself a bonus out of the funds belonging to Clark. Clark's money apparently went to other creditors. But paying oneself a "bonus" is not the only way to manifest an intent to defraud. The debtor had written Clark a check dated April 15, 1982 for $5,000.00. The third installment of $10,000.00 from the package sale was due under the contract of sale on April 14, 1982. It is not likely that these dates are mere coincidence. It is more likely that the post-dated check represented an agreement to pay Clark out of the third installment. One can conclude that the debtor had an affirmative duty that arose upon receipt of the third installment to remit Clark his $5,000.00. Assuming there was such a duty, the debtor breached that duty and took pains to conceal the breach from Clark. The debtor's efforts to conceal the payment of the third installment provide evidence of fraudulent intent to deprive Clark of money rightfully his. *Cf. Matter of Storms*, 28 B.R. 761, 765 (Bankr.E.D.N.C.1983) ("Fraudulent intent may be negated by the fact that the debtor used such funds openly, without attempt to conceal, and had reasonable grounds to believe he had the right to so use.")

The debtor argues that his ultimate failure to repay Clark was caused by circumstances beyond his control: garnishments of his bank account and the final installment due from Cavalier Thoroughbred. Whether the debtor would have paid Clark in the absence of these creditor collections is speculative. What is beyond argument is that the debtor failed to put Clark on notice of Cavalier's payment of the third installment until after he filed bankruptcy. He made false oral statements to Clark and a false written statement to Clark's attorney, in each instance claiming that the third installment had not been paid and was the subject of pending litigation. He used each of the first three installments, $30,000.00 in all, to pay his own bills.

Under *Shuler, supra,* an affirmative duty to pay arises upon receipt of proceeds belonging to another. 21 B.R. at 644. Intent to deprive may be inferred from a failure to pay unless circumstances beyond debtor's control prevent remittance. *Id.* The debtor constructively received the proceeds in question in early May 1982. The "circumstances beyond his control" that he claims prevented him from discharging his duty to pay occurred in October or November 1983, over one year later.

When a debtor sold a race car belonging to an acquaintance but failed to remit the sale proceeds to him as previously agreed, the resulting debt was nondischargeable as an embezzlement. *In re Bevilacqua,* 53 B.R. 331, 3 Bankr.L.Rep. (CCH) ¶ 70,794, at 87,849 (Bankr.S.D.N.Y. Sept. 24, 1985). In *Bevilacqua,* the debtor's retention and use of the funds without the owner's authority amounted to a misappropriation. *Id.* at 87,848. The court inferred the fraudulent intent requisite for embezzlement from the fact that the debtor waited over a month after receiving the sale proceeds before mailing the owner a worthless check drawn on a closed bank account. *Id.* at 87,849. The debtor "kept the funds, either for his own personal use or for that of his [business]." *Id.* Because of the "strong" circumstantial evidence of the debtor's intent to defraud, the court found the debt to be nondischargeable under section 523(a)(4) of the Code. *Id.*

Generally, laws concerning dischargeability should be construed in favor of the debtor. *In re Graziano, supra,* 35 B.R. at 593. Claims under section 523(a)(4) deserve special scrutiny to insure that the debtor's rights under the Code are protected. *Id.* Nevertheless, the clear and convincing circumstantial evidence in the case *sub judice* constrains the Court to find that an embezzlement has occurred within the meaning of section 523(a)(4) of the Code. The debt of $5,000.00 listed on the debtor's Schedule A-3 and owed to W. Donald Clark on "open account on the sale of a horse" is therefore nondischargeable in bankruptcy.

An appropriate Order will enter.