**In re Earl Charles TAYLOR, Debtor.**

**ALLIANZ INSURANCE COMPANY, Plaintiff,**

v.

**Earl Charles TAYLOR, Defendant.**

**Bankruptcy No. 84–01454–R.
Adv. No. 85–0007–R.**

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

July 2, 1986.

Nathan Wasser, Landover, Md., for plaintiff.

Harry M. Johnson, Richmond, Va., for defendant.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter comes before the Court upon the complaint of the plaintiff, Allianz Insurance Company ("Allianz"), for a determination that a debt owing to it by the debtor and defendant in the above-styled proceeding, Earl Charles Taylor ("Taylor"), is nondischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(2). Taylor filed an answer in response to Allianz' complaint, and a trial was conducted on the issues raised by the parties on January 23 and 24, 1986. At the conclusion of said trial, briefs were ordered by the Court and this matter was taken under advisement. Accordingly, based upon the evidence adduced at trial, the briefs filed by the parties, and the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

Taylor filed a petition for relief under Chapter 7 of Title 11 of the United States Code on October 2, 1984. Prior to the filing of his petition, from September 1979 to February 1982, Taylor was employed as a territorial salesman by Heraeus Dental Gold Corporation ("Heraeus"), formerly known as A. Szabo Company. Taylor sold precious and semi-precious metals and alloys, along with equipment used in the trade, to various dental labs in the Washington, D.C. metropolitan area.

The testimony at trial indicated that Taylor, like most salesmen in the dental gold business, carried his inventory with him, and upon receiving an order from a dental lab while making a sales call, Taylor often would deliver the metal ordered directly from his inventory. The customer was required to sign a sales invoice, acting as Heraeus' proof of delivery, and after delivering the original to the customer, Taylor was required to send one copy to Heraeus' main office in New York for posting to the customer's account and he would retain one copy for himself. Heraeus did, and still does, bill its customers on a monthly basis.

Although Taylor's sales manager, Leonard Stern ("Stern"), stated at trial that Taylor was not authorized to hold a ticket for a more favorable gold price before sending it to New York, it was the testimony of the three dental lab proprietors who testified at trial that Taylor routinely did not price tickets at the time he made a sale to them. Instead, he often held invoices for several days in order to give the customer the benefit of any downward fluctu-

ation in the price of gold. Stern further testified that Taylor was required to call in daily between 10:30 a.m. and 11:30 a.m. to get the current gold quote. Although Taylor's practice of delaying the invoices would be of no personal monetary gain to him, it would give him a competitive advantage over other dental gold suppliers and it would work to the detriment of his employer.

One incident of Taylor's practice of delaying invoices was that the invoices were incomplete when Taylor left the dental lab, as the total purchase price was left blank since Taylor was holding out for the lowest periodic quote. The testimony indicated that in late 1981 and early 1982 certain dental labs in Taylor's territory discovered that they were being billed for merchandise they never ordered, and that tickets were being altered to reflect items never used by the individual labs. In fact, Sheik Mohammed ("Mohammed"), the proprietor of Silver Springs Dental Lab, testified that of 23 invoices submitted into evidence from his place of business, only one ticket bore his actual signature and that particular invoice had been altered.

Mohammed was one of the first dental lab proprietors to notice his account with Heraeus showing an unusually large balance. Mohammed testified that when he became aware of his account's inflated balance he completely stopped purchasing from Heraeus, yet the account continued to rise. As a result, Mohammed contacted Taylor for an explanation, and Mohammed stated that Taylor told him that his account was being inadvertently billed for gold shipped to another customer, and that he, Taylor, would immediately take steps to remedy the situation. Taylor was to promptly arrange for a $5,000 credit to be applied to Mohammed's next monthly statement; however, Taylor only managed to get a credit for 5 ounces of gold.

When the $5,000 credit was not forthcoming, Mohammed contacted Heraeus directly. Upon receiving copies of the invoices billed to his account Mohammed discovered a significant number of invoices that had been submitted with his signature placed on them without his authority. According to Mohammed, when Taylor was confronted with the questioned invoices he admitted that he had in fact signed Mohammed's name to those invoices. The explanation proffered on Taylor's behalf was that the invoices were merely being altered to reflect an increase in the number of alloy units sold by Taylor, even though there would be some ultimate discrepancy in price. For example, Taylor asserts that if he sold 5 ounces of alloy X at $100 per ounce for $500 he would on occasion bill the sale as 10 ounces of alloy Y at $50 per ounce for the same price. According to the testimony, Taylor was apparently under some pressure to increase his sales quotas, the quotas being set by units sold rather than total dollar sales.

A similar situation arose with the DeConti Dental Lab, a small operation owned and operated by Joseph DeConti ("DeConti"). DeConti testified that he purchased regularly from Taylor and that his account balance began to rise at about the same time Mohammed began having problems with his account. DeConti stated that of 21 tickets submitted into evidence, only four bore his actual signature. DeConti, as did Mohammed, asserted that he never gave Taylor, or anyone else, the authority to sign his name to a sales invoice, and that it would be a rare occasion when even an employee signed for gold or other valuable metals.

DeConti, a native of Brazil, became aware of the problem in his account when he returned from Brazil after the 1981 Christmas holidays. During his absence, the dental lab was completely shut down and upon his return he noticed that sales were billed to his account during the period of time he was out of the country. DeConti contacted Taylor and informed him of the problem with the account, having since discovered other invoices billed to him of which he did not have a record, and Taylor asked DeConti not to call Heraeus, stating that he would fix the problem himself. When Taylor took no action, DeConti called

Heraeus' New York office and asked for copies of the missing invoices reflected by his statement of billings. It was upon receipt of the copies of the invoices submitted to Heraeus for posting to his account that DeConti discovered the excess billings. DeConti stated that he subsequently received a credit against his account from Heraeus for approximately $4,000.

The third proprietor of a dental lab called by Allianz was Wallace Johnson ("Johnson"), the proprietor of Allegiance Dental Lab. Johnson became aware of the increases in his monthly statement in October 1981 after he had begun to cut back his overall dental gold purchases. Johnson testified that he spent the entire New Year's Day of 1982 going over his records, and, realizing the errors, he then called Heraeus to request copies of invoices of which he did not have a record and that were billed to his lab's account.

Johnson testified that about ten to fifteen minutes after he spoke to the main office of Heraeus he got a phone call from Taylor. According to Johnson, Taylor stated that he had mistakenly billed Johnson's lab for goods actually delivered to Allegheny Dental Lab, apparently hoping to explain the mixup on the confusion of the similar names. When Johnson told Taylor that Heraeus had informed him that his name was signed to all the tickets, Johnson stated that Taylor admitted signing Johnson's name. Johnson further testified that Taylor stated that he was having personal problems, and that he would make up what Johnson estimated to be an approximate $5,000 discrepancy in his account.

It was Johnson's testimony that Taylor offered to clear up the balance on Johnson's account by personal check; however, Johnson stated that he informed Taylor that he would accept nothing less than a cashier's check in order not to pursue the matter with Heraeus. Taylor never paid Johnson any amount on the account. Johnson later testified that of the 16 invoices from his lab submitted into evidence by Allianz, 10 bore forgeries of his signature. Heraeus, according to Johnson's testimony,

allowed him a $6,200 initial credit and an additional $1,900 credit to be used at $100 a month on his future purchases as a result of the discrepancies in his account. At this time, the entire $1,900 credit has been consumed.

As a result of the problems in Taylor's territory, Heraeus made a claim to its insurer, Allianz, in February 1982. Once the claim was made, Allianz assigned an insurance adjustor, Daynard & VanThunen, to undertake an investigation of the claim. Daynard & VanThunen in turn hired Futterman & Goldglit, an accounting firm, to assist in determining the amount of the claim and the damages suffered. Heraeus had previously hired Peat, Marwick, Mitchell & Company ("Peat, Marwick") to undertake an audit of Taylor's inventory.

Originally, Leon Futterman, the accountant who prepared the report for Daynard & VanThunen, was scheduled to testify for Allianz. However, several days prior to trial Futterman became ill and Robert Mandeltort ("Mandeltort") appeared on his behalf. Mandeltort is a certified public accountant with Futterman's firm; however, he had no connection with the Taylor investigation and he had only been asked to review the file one day prior to trial.

Allianz sought to introduce the audit reports prepared by Futterman & Goldglit into evidence and to offer Mandeltort's testimony as to how the audit reports were prepared. Counsel for Taylor objected to the introduction of the audit reports on the ground that the reports were inadmissible hearsay and that Mandeltort could not testify as to the compilation of the reports since he did not participate in their preparation. The Court made an initial ruling allowing Mandeltort to testify and to allow the documents into evidence; however, the ultimate issue of the reports' admissibility was taken under advisement.

With regard to the reports' preparation, Mandeltort testified that confirmations were mailed out by Heraeus to the individual laboratories in Taylor's territory, requesting that a comparison be made between Heraeus' accounts receivable and

the customer's accounts payable. A number of dental labs showed a conflicting balance and an invoice by invoice audit was then conducted for each customer that had a conflicting account. Based upon those audits, a figure was arrived at for each dental lab indicating the amount allegedly billed to that customer by virtue of forged and altered sales invoices. Mandeltort testified that in his opinion the amounts reflected in the report accurately reflected the amount of the claim to be paid Heraeus, and that computations regarding the inventory audit done by Peat, Marwick were also correct. The final report states that the claim to be paid to Heraeus totalled $58,127.96, and a cancelled check from Allianz and made payable to Heraeus in that amount was submitted into evidence as Plaintiff's Exhibit # 2. As a condition of payment on the claim, Allianz took an assignment of rights and a final release from Heraeus, thereby subrogating Allianz to any rights Heraeus might have against Taylor. (*See* Plaintiff's Exhibit No. 3).

## CONCLUSIONS OF LAW

Allianz contends that while Taylor was employed by Heraeus he wrongfully altered sales invoices from customers in his territory to reflect increased sales and prices and that he signed his customers' names to invoices for goods never ordered nor received by those customers. As a result of this alleged activity, Allianz asserts that Taylor converted portions of his inventory to his own use and that Taylor's customers unknowingly paid excessive amounts to Heraeus in accord with their monthly statements, thereby requiring Heraeus to compensate Taylor's customers for the amounts overpaid. Consequently, Allianz, as subrogee of Heraeus, seeks to have the debt created by Taylor's alleged

conduct be declared nondischargeable in bankruptcy as constituting the obtaining of money, property, or services by actual fraud under 11 U.S.C. § 523(a)(2)(A).[1]

Section 523(a)(2)(A) of the Bankruptcy Code provides as follows:

(a) a discharge under § 727 ... does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's financial condition ...

11 U.S.C. § 523(a)(2)(A). This Court has previously set forth the elements necessary to prove a debt nondischargeable under § 523(a)(2)(A). In *In re Hazelwood*, 43 B.R. 208, 211 (Bankr.E.D.Va.1984), this Court held that an allegation of actual fraud or false pretenses must be made out by showing: (1) that the debtor made the representations; (2) that at the time of making the representations the debtor knew they were false; (3) that the debtor made the representations with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained the alleged loss and damage as a result of the representations having been made. *See also In re Taylor*, 58 B.R. 849, 851 (Bankr.E.D.Va.1986); *In re Carneal*, 33 B.R. 922, 925 (Bankr.E.D.Va.1983); *In re Holt*, 24 B.R. 696, 698 (Bankr.E.D.Va.1982); *Sweet v. Ritter Finance Co.*, 263 F.Supp. 540 (W.D.Va.1967). Each of the above elements must be proved by clear and convincing evidence. *Hazelwood*, 43 B.R. at 211; *Brown v. Buchanan*, 419 F.Supp. 199 (E.D. Va.1975).

---

1. Taylor, during his tenure as a salesman for Heraeus, had in his possession certain equipment of Heraeus for sale to dental laboratories, specifically two (2) casting machines, two (2) burn out furnaces, and two (2) ring ejectors. Allianz apparently paid Heraeus the value of the equipment; however, given that Taylor admitted having the equipment and that he attempted to surrender the equipment to Heraeus, the Court made a finding at the conclusion of the trial that Taylor had no fraudulent intent with regard to any alleged misappropriation of the equipment in his possession. The Court ordered Taylor to surrender the equipment and that appropriate arrangements be made by either Heraeus or Allianz to pick up the equipment from Taylor's residence.

With respect to the first element, it is clear that Taylor made the representations which formed the basis of Allianz' claim, *i.e.* he signed or altered sales tickets submitted to Heraeus for posting to the accounts of customers in his territory without the authorization of those customers. Mohammed, DeConti, and Johnson, the three dental lab operators who testified at trial, as well as Stern, Taylor's sales manager, all stated that Taylor admitted signing his customers' names to the sales invoices or altering the invoices after he left the dental labs. The lab operators testified that they never gave Taylor their permission for him to sign their names, and, according to Stern, it was not company policy for a salesman to sign a customer's name if the salesman mistakenly forgot to obtain the signature at the time the inventory was delivered. Taylor did not refute Allianz' testimony, nor did he produce any evidence that someone other than he either made the alterations to the invoices or signed the forged tickets, or that another individual had the opportunity to do so.

Elements two and three may be taken together. The evidence indicates that at the time Taylor altered or signed the questioned invoices, he knew that he was not authorized to do so, and even though the alterations were attempted to be rationalized by stating Taylor's desire to merely increase his sales of slower moving alloys while keeping the total sales price approximately the same, no evidence was proffered which would explain the numerous invoices with forged signatures which apparently were completely fabricated by Taylor. It is evident that Taylor expected the items delineated on a given invoice to be billed to the named customer's account, and given Taylor's familiarity with his customers' operations, he was likely aware that they did not have substantial business sophistication and that their bookkeeping procedures were not such that they would readily discover inaccuracies in their accounts. Accordingly, the Court concludes that not only did Taylor know that the representations on the invoices were false, but that he intended that Heraeus bill the customers listed on the invoices for the items listed therein. Whether the motive was to increase his sales or to convert his inventory, there was clearly an intended deception.

The fourth element, *i.e.* whether Heraeus relied upon Taylor's false representations, is also satisfied. The evidence showed that when Taylor's sales invoices came into the New York office, the items listed on the invoices were deleted from his inventory and posted to the individual lab accounts. Hereaus had no indication that Taylor submitted false invoices for billing until office personnel in New York brought the credit issued to Mohammed to Stern's attention. The evidence showed that as a result of Taylor's submission of the false invoices and Heraeus' posting them to Taylor's customers' accounts, Heraeus was forced to issue credits to those customers who were billed for goods neither ordered nor received. Moreover, Heraeus replenished Taylor's inventory based upon the reduction in stock reflected by his sales invoices, and it is apparent that not all of the inventory was accounted for, even though the exact amount is in question. Thus, the reliance by Heraeus on the representations made by Taylor is established.

The fifth element, damages, is the element which causes the most difficulty, given that the audit reports sought to be introduced by Allianz are its primary evidence as to damages, and Taylor has objected to the reports' admission by asserting they are inadmissible hearsay. Allianz asserts that the audit reports are admissible under (1) the business records exception to the hearsay rule, *see* Fed.R.Evid. 803(6) and (2) as a basis of expert testimony, *see* Fed.R.Evid. 703. It is at this point that the Court is required to review the applicability of those rules to the reports prepared by Futterman & Goldglit for Allianz' insurance investigator Daynard & VanThunen.

Under Federal Rule of Evidence 803(6) a memorandum or report is admissible if it is "(1) made by a regularly conducted business activity, (2) kept in the 'regular course' of that business, (3) 'the regular

practice of that business is to make the memorandum,' (4) and made by a person with knowledge or from information transmitted by a person with knowledge." *Paddack v. Dave Christiansen, Inc.*, 745 F.2d 1254, 1258 (9th Cir.1984) *citing Clark v. City of Los Angeles*, 650 F.2d 1033, 1036–37 (9th Cir.1981) *cert. denied* 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 443 (1982). Moreover, business records are admissible "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." *Id.;* Fed. R.Evid. 803(6).

In *Paddack, supra,* the Ninth Circuit addressed a situation very similar to that presented in this case. The defendant in *Paddack,* an employer, was required to contribute certain amounts to employee trust funds, and the trustees of the trust funds apparently suspected that the employer's reports of its contributions were inaccurate. As a consequence, the trustees employed Touche Ross & Company to perform a compliance audit of the employer's contributions, and upon the audit's completion, the audit reports suggested that the employer had wrongfully failed to contribute a substantial amount to the trust funds created for the benefit of its employees. Based upon the deficiencies, the trustees brought suit for breach of contract of the collective bargaining agreement establishing the trusts and to recover damages for the unpaid contributions. *Paddack,* 745 F.2d at 1257. The district court found that the audit reports were not made or kept in the ordinary course of business and, further, that they were prepared for purposes of litigation. On appeal the Ninth Circuit affirmed the district court, holding that while the audit reports were not the business records of the trust funds or the employer given that the administrator of the trust funds testified that the trustees had no regular compliance audit procedure. *Id.* at 1258. The Circuit Court found persuasive the fact that no evidence was submitted that compliance audits were conducted with any regularity, and that only upon the suspicion that a deficiency existed did the trustees seek an accountant to perform a compliance audit. *Id.*

The court also held that the compliance audit reports done for the trustees could not be viewed as business records of the accountants. The court held that it was not a normal financial statement audit, but, rather, a special audit ordered in response to the trustees' suspicion of irregularities. The audit reports were ruled to be the direct product of the accountants, but not business records of the accounting firm within the meaning of Rule 803(6). The Ninth Circuit held that a contrary interpretation would allow any firm to produce "business records" that would be automatically admissible, and would otherwise defeat the underlying purpose behind Federal Rule 803(6) in that "[s]uch reports do not contain the same reliability that normally attends records kept in the course of a regularly conducted business activity." *Id.*

Lastly, the court held that even if it could be concluded that the audit reports were the accountant's business records, finding that the reports were prepared in anticipation of litigation precludes their admission. The court ruled that the trustees had employed Touche Ross only after they suspected that the employer's contributions were deficient, and "[a] document prepared for purposes of litigation is not a business record because it is lacking in trustworthiness." *Id.* at 1259, *see Clark,* 650 F.2d at 1037 (citing *Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943)).

As the trustees failed to establish in *Paddack,* there is no evidence that Heraeus had a regularly established compliance audit procedure. Mandeltort testified that Peat, Marwick, Mitchell & Company was employed to conduct an audit of Taylor's inventory, and that his firm, Futterman & Goldglit, was not hired by Heraeus but instead by Danard & VanThunen, the insurance investigator for Allianz. It is clear that the only reason the audit by Mandeltort's firm was undertaken was to determine the extent to which Heraeus was damaged by Taylor's activities in order to establish the amount of the claim under Allianz' employee fidelity policy. Clearly, the audit done on behalf of the insurance

investigator was not a regularly conducted business activity of Heraeus, and although Mandeltort testified that his accounting firm does a substantial amount of work for insurance companies, this particular audit was unique to the present situation, and although done pursuant to generally accepted accounting principals, the documents produced from it lack the trustworthiness of documents not prepared for possible litigation.

 *Paddack* also addressed the admissibility of the accounting reports by Touche Ross under Fed.R.Evid. 703. Under Rule 703, "the facts or data in the particular case upon which an expert bases an opinion or inference ... need not be admissible in evidence." The trustees in *Paddack*, as has Allianz in this case, sought to have an accountant testify from the audits, and using those audits as a basis for opinion testimony, establish the facts stated in the audit as evidence of the deficiencies. As *Paddack* held, and this Court holds as well, audit reports are not admissible to prove the existence of or establish the truth of what they assert.

Under Fed.R.Evid. 703, hearsay evidence, or other inadmissible evidence, is permitted solely for the limited purpose of explaining the basis of an expert's opinion; however, the inadmissible evidence is *not* proof of the truth of the underlying matter. *Paddack*, 745 F.2d at 1262. The audit reports in this case are admissible to show the basis of Mandeltort's testimony, but Mandeltort testified that he thought the figures reached by his firm were accurate and that the figures reached by Peat, Marwick were conclusive as to the shortage in Taylor's inventory. Mandeltort expressed no independent opinion as to the damage suffered by Heraeus as a result of Taylor's actions, instead choosing to rely on the audit reports as proof of the actual numbers therein. This Court finds that the testimony of Mandeltort is insufficient to prove damages based solely upon the audit reports, especially in light of the fact that Mandeltort had no connection to the preparation of the reports. Moreover, no witness was available for cross-examination by the defendant who either prepared the reports, who could give first hand knowledge of how the reports were prepared, or who would have actual knowledge of the underlying information that was used to formulate the reports.

The only evidence that this Court has before it that Heraeus has been damaged by the actions of Taylor in altering or forging the signatures of his customers on sales invoices are the credits actually issued to those customers. There is no evidence of damage suffered by any entity requiring the issuance of a credit by Heraeus other than from the three dental labs whose representatives testified at trial. The Court finds from the testimony that Silver Spring Dental Lab received a credit of $9,800, DeConti Dental Lab received a credit of $4,000, and that Alligence Dental Lab received a credit of approximately $8,100. Accordingly, there is evidence before the Court that Heraeus was damaged in the amount to the extent that it was forced to issue credits in the amount of $21,900, and for that reason the debt owing to Allianz by Taylor should be held nondischargeable in that amount.

An appropriate Order will issue.